IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

WELLS FARGO BANK, N.A.          *

                                *

          Plaintiff             *

          vs.                   *

                                *   CIVIL ACTION NO. MJG-08-2439

CHESAPEAKE FINANCIAL            
SERVICES, INC., et al.          *

          Defendants            *

*       *       *       *       *       *       *       *       *

## MEMORANDUM AND ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

The Court has before it:

1.   Plaintiff Wells Fargo Dealer Services[1], Inc.'s Motion
     for Partial Summary Judgment as to Defendant
     Chesapeake Financial Services, Inc.'s Liability for
     Breach of Contract (Count I and Count III) and Philip
     Colonna's Liability for Breach of Contract (Count IV)
     [Document 120];

2.   Defendant Atlantic Boat Documentation, Inc.'s Motion
     for Partial Summary Judgment [Document 128];

3.   Plaintiff's . . . Motion for Partial Summary Judgment
     as to Atlantic Boat Documentation, Inc.'s Liability
     for Negligence [Document 137];

4.   Defendants Chesapeake Financial Services' and Philip
     Colonna's Motion for Summary Judgment [Document 179]
     (sealed);

---

[1]   Effective June 30, 2011, Wells Fargo Dealer Services, Inc.,
merged into Wells Fargo Bank, N.A. and ceased to exist as a
separate corporate entity.  On December 11, 2012, the Court
granted Plaintiff's Request to Amend Case Caption Wells Fargo
Dealer Services, Inc. with Wells Fargo Bank, N.A. as the named
plaintiff [Document 228].

5.     Defendant/Cross-Defendant Atlantic Boat Documentation, Inc.'s Motion for Summary Judgment [Document 183];

6.     Plaintiff's . . . Motion for Summary Judgment [Document 195];

7.     Defendant/Cross-Defendant Atlantic Boat Documentation, Inc.'s  Motion to Strike Portions of Plaintiff's Reply (Document No. 214) and to Strike the Affidavits of Meere (Document No. 214-1) and Murphy (Document No. 214-2) in their Entirety [Document 217]; and

8.     Plaintiff's Motion in Limine to Preclude Testimony of Defendant Chesapeake Financial Services, Inc.'s Designated Experts David Griffith, Thomas J. Lekan, and Charles Brian Diggs [Document 175].[2]

and the materials submitted relating thereto.

The Court has held a hearing and has had the benefit of the arguments of counsel.

I.   INTRODUCTION

As discussed at length herein, two conmen perpetrated a fraud that caused a lender to fund a fraudulent boat purchase loan.  The scam yielded the conmen approximately $885,000 as well as, eventually, prison sentences.  The lender has brought the instant law suit to recover its loss from the broker, who arranged the loan, and/or the documentation company retained to document the transaction.  The broker, if held liable, seeks to

---

[2]     A summary chart illustrating which party is seeking summary judgment on which claim is attached hereto as Appendix A.

cast away blame (and liability) by placing it upon the documentation company.

The cast consists of:

- The Conmen - Michael Vorce ("Vorce") and James Jett ("Jett")

- The Boat – the Faithful, a 56-foot Viking yacht

- The Purported Boat's Owner/Seller – JRP Marine LLC ("JRP Marine") owned by Roy and Jan Pence ("the Pences")

- The Purported Purchaser/Borrower - Victor Cribb Jr. ("Cribb")

- The Lender - Wells Fargo Dealer Services ("Wells Fargo")

- The Loan Broker - Chesapeake Financial Services, Inc. ("Chesapeake"), whose principal is Philip Colonna ("Colonna")

- The Documentation Company - Atlantic Boat Documentation, Inc. ("ABD")

In general, the scheme worked like this:

- The Conmen identified the Boat (which was actually for sale) and the identity of the Owner, JRP Marine.

- The Conmen obtained the credit report of Cribb providing his identity information and establishing his financial ability to purchase the Boat.

- The Conmen contacted Chesapeake and, using fabricated documents, presented an application for a loan to finance Cribb's purchase of the Boat.

- Chesapeake put together a "credit package" and sent it to Wells Fargo and ultimately obtained approval of the loan.

- Chesapeake retained ABD to effect the proper filing of documents to establish what, absent fraud, would have been a security interest in favor of Wells Fargo.

- Wells Fargo paid the loan proceeds of $885,000 to Chesapeake who in turn wired the proceeds to an account it believed to be that of Cribb's investment banker, but in reality was controlled by the Conmen.

As discussed at length herein (and in the order discussed herein), the Court concludes:

1. Chesapeake and Colonna are entitled to summary judgment on the RICO claims (Counts VI and VII).

2. Wells Fargo is entitled to summary judgment on its contract claims against Chesapeake and Colonna (Counts I, III, and IV) subject to the still pending affirmative defense of equitable estoppel.

3. With respect to Chesapeake's breach of contract cross claim against ABD (Claim I), ABD is entitled to partial summary judgment establishing that it had no "verification obligation" but there is a material dispute of fact regarding the alleged "Certificate of Documentation obligation" (as defined herein) with respect to the Cribb transaction.

4.  As to Wells Fargo's negligence claim against
    Chesapeake (Count II), Chesapeake is not entitled to
    partial summary judgment establishing no liability and
    Wells Fargo will be permitted to designate Mr. Lynn as
    an expert in support of its negligence claim, subject
    to the conditions discussed herein.  Absent adequate
    expert testimony, Wells Fargo's negligence claim will
    be limited to Acts 2 and 3 (as defined herein).
    Chesapeake is not entitled to summary judgment on its
    contributory negligence defense.

5.  As to Wells Fargo's negligence claim against ABD
    (Count V), Wells Fargo is entitled to partial summary
    judgment establishing that ABD owed it a tort duty to
    exercise reasonable care in the provision of its
    "documentation services" in the Cribb transaction.
    ABD is entitled to partial summary judgment
    establishing that this duty does not include an
    affirmative duty to investigate or prevent fraud in
    the underlying boat sale transaction.  There is a
    genuine issue of material fact regarding whether ABD
    acted as the agent of Wells Fargo in connection with
    the Cribb transaction thereby giving rise to certain
    fiduciary duties.  There exist genuine issues of
    material fact regarding whether ABD breached its tort
    duty (and potentially any duties based upon a finding
    of agency) in the ways identified by Wells Fargo.

## II.  BACKGROUND

### A.  Loan Approval Process – Wells Fargo and Chesapeake

On August 27, 2007, Wells Fargo entered into the "Marine
Operating Agreement" ("MOA") with Chesapeake in an attempt to
"consolidate the number of loan brokers sending it business."

C&C's[3] Summ. J. [Document 179-1] (sealed) at 5.  The MOA governed

the obligations of Chesapeake and Wells Fargo in relation to

Chesapeake's submission of "Credit Packages"[4] on behalf of

persons seeking to finance boat purchases and Wells Fargo's

origination of promissory notes and related security agreements

in connection therewith.  When an "Obligation"[5] involved the

granting of a security interest in the boat as collateral for

the loan, the responsibility for documenting the boat with the

United States Coast Guard, including performing tasks related to

perfecting a preferred ship mortgage[6] through recordation with

the Coast Guard, rested with Chesapeake or the boat

documentation service company Chesapeake used for such tasks.

See MOA § C(3)(e),(4).

Upon receipt of a "Credit Package" from Chesapeake, Wells

Fargo reviews the materials and either (1) disapproves the loan,

(2) approves the loan, or (3) approves the loan with conditions.

---

[3]     Defendants Chesapeake and Colonna are sometimes
collectively referred to as "C&C."
[4]     The MOA defines the term "Credit Package" to include
"credit applications and . . . other credit information."  MOA
at 1.
[5]     The MOA defines "Obligation" as "installment promissory
notes and related security agreements which evidence a direct
loan" by Wells Fargo.  Id.
[6]     As discussed infra, a preferred ship mortgage is a
"lien on the mortgaged vessel in the amount of the
outstanding mortgage indebtedness secured by the vessel"
and has special implications in the marine realm.  See 46
U.S.C. § 31325.

Upon approval by Wells Fargo, Chesapeake prepares certain papers for the loan, including the promissory note. Chesapeake then forwards the promissory note, related security agreements, the preferred ship mortgage, and any other documents to the loan applicant for signature. Upon return of the executed documents to Chesapeake from the loan applicant, Chesapeake forwards them to Wells Fargo with any other documents required by Wells Fargo, such as a copy of the loan applicant's driver's license (the "Closing Package"). Wells Fargo then reviews the Closing Package and makes a determination as to whether to fund the boat loan. If Wells Fargo decides to fund the boat loan, it sends a funding notice to Chesapeake. See MOA § A, B.

B.    Documentation Process – Chesapeake and ABD

As provided in ABD's brochure for "Vessel Documentation and the Service that Provides It," boat documentation is "a national form of registration" for vessels with the Coast Guard's National Vessel Documentation Center ("NVDC"). [Document 195-12]. The documentation "provides evidence of nationality" for a boat and involves recordation of certain documents with the Coast Guard. Id.

In a financing situation, the boat documentation process includes filing a preferred ship mortgage with the Coast Guard

for recording in order to perfect any security interest provided therein and/or in related security agreements.[7]

When Wells Fargo requires a boat loan to be documented with the Coast Guard, Chesapeake can obtain documentation services by making a request to ABD. Although the parties dispute the actual role and duties of ABD in a transaction involving Chesapeake and Wells Fargo, ABD <u>at a minimum</u> performs the following tasks, not necessarily in this order:

1. ABD uses the information provided by Chesapeake regarding the boat loan to create an in-take sheet and load that information into its computer database. Such information includes the seller's name, the boat name and Hull ID, the buyer's name, and the lender's name;

2. ABD obtains the Abstract of Title on the boat involved in the transaction from the Coast Guard;

3. If one of the parties to the boat sale is an entity, ABD confirms the entity is in good standing in its state of incorporation or organization;

4. ABD prepares paperwork for the buyer to sign including, <u>inter alia</u>, (1) a limited power of attorney (an authorization for ABD to act as the

---

[7] Preferred ship mortgages are governed, in part, by the Ship Mortgage Act of 1920, amended and recodified in 46 U.S.C. § 313, <u>et seq</u>. A preferred ship mortgage is a mortgage that covers a documented vessel or a vessel for which an application for documentation is filed. <u>Id.</u> § 31322(a)(3)(A)-(B). The Ship Mortgage Act grants the holder of a preferred ship mortgage "the right to proceed in admiralty with a preferred status over all claims except certain maritime liens and expenses, and fees and costs fixed by the court." <u>See Chase Manhattan Fin. Servs., Inc. v. McMillian</u>, 896 F.2d 452, 458 (10th Cir. 1990).

buyer's agent with the NVDC); (2) Coast Guard
Form: Application for Initial Issue, Exchange or
Replacement of Certificate of Documentation,
Redocumentation (change in title ownership); (3)
First Preferred Ship Mortgage; (4) and an ABD
document called Information Verification and
Authorization Sheet[8] (collectively the "Buyer's
Paperwork")[9];

5.     ABD prepares paperwork for the seller to sign
       including the Bill of Sale and limited power of
       attorney for ABD to act as the seller's agent
       (collectively the "Seller's Paperwork");

6.     The Buyer's Paperwork and Seller's Paperwork are
       sent to the buyer and seller[10], respectively for
       signature, some of which are required to be
       notarized per the Coast Guard;

7.     ABD requests the original Certificate of
       Documentation for the boat from the seller;

8.     Upon return of all paperwork to ABD and provision
       of the executed promissory note and related

---

[8]     The Information Verification & Authorization Sheet permits
ABD to act as the agent of the buyer/borrower "in all matters
relating to the documentation" of the vessel and warns that:

         PLEASE     NOTE     THAT     ATLANTIC     BOAT
         DOCUMENTATION,    INC.   RELIES   UPON    THE
         INFORMATION PROVIDED BY THE PARTIES TO THIS
         TRANSACTION. PLEASE REVIEW THE INFORMATION
         STATED   BELOW.    IF   ANY   CORRECTIONS   ARE
         NECESSARY,   MARK   THIS   FORM   ONLY.    IF
         ADDITIONAL INFORMATION IS REQUIRED, PLEASE
         PROVIDE   THE   REQUESTED   INFORMATION   WHERE
         ARROWED.

[Document 195-16].
[9]     The buyer's limited power of attorney and first preferred
ship mortgage are form or template documents provided to ABD by
Wells Fargo.  ABD completes these documents by filling in the
designated blank spaces with information specific to a
transaction.  These form documents contain the Wells Fargo logo
at the top left hand corner.
[10]    Not necessarily by ABD.

9

security agreements to ABD by Chesapeake, ABD
completes the first preferred ship mortgage, and
files certain of the Buyer's and Seller's
Paperwork with the NVDC with a cover letter and
payment for the Coast Guard registration fee[11];

9.   After approval and recording of the filings by
     the Coast Guard, ABD receives a new Certificate
     of Documentation and copy of the recorded first
     preferred ship mortgage from the Coast Guard; and

10.  ABD sends the newly-issued Certificate of
     Documentation to the buyer with a copy to Wells
     Fargo and sends a copy of the recorded first
     preferred ship mortgage to Wells Fargo.

Childs Aff. [Document 183-3] ¶¶ 4-8.  In 2008, ABD charged a fee

of $495 for its services, which included the filing fee of $112

charged by the Coast Guard, resulting in a net payment to ABD of

$383.  Id. ¶ 8.

---

[11]   By filing these documents with the Coast Guard, ABD seeks
to achieve the redocumentation of the boat in light of the
change of ownership as well as recordation of the preferred ship
mortgage.  In order for a lender to maintain and perfect a
security interest in a documented vessel, it must record the
preferred ship mortgage with the Coast Guard in substantial
compliance with applicable rules.  See In re Sherman, 11-32821
LMW, 2012 WL 2132379, at *4 (Bankr. D. Conn. June 12, 2012); see
also 46 U.S.C. § 31322(a) ("A preferred mortgage is a mortgage,
whenever made, that ... is filed in substantial compliance with
section 31321 of this title  . . .").

C.    The Transaction At Issue

1.    Loan Approval

On May 20, 2008, Vorce and Jett submitted to Chesapeake, via the Internet, an application in Cribb's name[12] for a loan of $885,000 to finance the purchase of the Faithful, a 56-foot Viking yacht then actually being offered for sale by its owner, JRP Marine, at a price of $1,795,000.  The loan application represented that Cribb was 51-years-old and resided at 777 S. Flagstar Drive, West Palm Beach, Florida.

The fraudulent Yacht Purchase and Sale Agreement, purportedly between Cribb and JRP Marine c/o Roy Pence, provided for the sale of the Faithful to Cribb for $1,795,000 and required that "the sum of five-hundred-thousand-dollars USD 500,000.00 of the SELLING PRICE shall be paid as a deposit upon execution of this agreement."  Of course, there never was any such payment.

After receiving the loan application, Chesapeake "pulled Cribb's credit report, and saw a high credit score."  C&C's Summ. J. [Document 179-1] (sealed) at 8.  Chesapeake then "contacted [a conman posing as] Cribb and asked him to provide tax returns and a personal financial statement."  Id. at 8-9. The Conmen fabricated those documents and forwarded them to

---

[12]    Vorce and Jett had stolen the identity of Cribb, an actual person, by hacking into a website and obtaining Cribb's credit report and then fabricating tax returns, financial statements, and contact information.

Chesapeake, who received them later that day. Id. at 9. Once
Chesapeake obtained these documents, Chesapeake faxed the loan
application, the tax returns, and personal financial statement
to Wells Fargo (i.e., the Credit Package) on May 21, 2008. Id.

On May 21, 2008, Kimberly Crocker ("Crocker") of Wells
Fargo reviewed Cribb's Credit Package by, among other things,
using Wells Fargo's "CreditRevue" system, which pulls a credit
report for the loan applicant and analyzes the loan application
documents. The CreditRevue system "flagged" (i.e., indicated
fraud) as to the address listed in the loan application. In
response, Crocker used Zillow.com to search for the address, but
the website could not locate it. Other discrepancies with the
loan application that were not "flagged" by CreditRevue existed
as well. For instance, the Credit Report pulled by CreditRevue
showed Cribb's birth year as 1915, noted the social security
number was issued prior to 1951, and showed Cribb had an
American Express card in 1965. However, the Credit Package
submitted by Chesapeake showed Cribb's birth year as 1956.

Wells Fargo conditionally approved the loan application
requesting that Cribb "(i) produce a utility bill to 'verify'
the address, (ii) forward documents showing that the amounts in
his banks accounts were 'liquid', and (iii) provide a boat
survey and purchase agreement." C&C's Summ. J. [Document 179-1]
(sealed) at 10-11. On May 29, 2008, after receiving the

12

documents requested (except the Yacht Purchase and Sale Agreement)[13] from Chesapeake, Wells Fargo approved the loan and informed Chesapeake that it could begin the boat documentation process.

## 2.   The Documentation – ABD

On May 30, 2008, Chesapeake contacted ABD and provided information regarding the Cribb transaction, which ABD recorded on its standard in-take sheet.  The in-take sheet reflected: (1) the name, address, phone number, and "Abstract Request Date" of the "dealer" (Chesapeake); (2) the name, social security number[14], address, and phone number of the buyer (Cribb); (3) the name and number of the lender (Wells Fargo); (4) information on the boat such as manufacturer, Hull ID, and name; and (5) the name and number of the seller (listed as Roy Pence).[15]  [Document 195-13].  ABD next obtained the Abstract of Title for the Faithful from the Coast Guard and checked to see if the entity JRP Marine was in good standing in its state of organization, Florida.

---

[13]    The utility bill and other documents produced by the Conmen purporting to be Cribb were fake.
[14]    There is a blank space for the social security number and there is a black mark in the blank.  It is unclear if ABD filled in this blank for the Cribb transaction.
[15]    Although a place existed for the seller's address, that area was left blank on the Cribb in-take sheet.

From the information on the in-take sheet and the Abstract
of Title, ABD filled in portions of the Buyer's Paperwork with
information specific to the Cribb transaction.  This included
filling in portions of electronic form or template documents
provided to ABD by Wells Fargo and maintained on ABD's computer
system, such as the First Preferred Ship Mortgage.  ABD then
sent the Buyer's Paperwork to Chesapeake to obtain Cribb's
signature.  ABD also telephoned (a conman posing as) Cribb to
ask if the buyer intended on renaming the Faithful.  Childs Aff.
¶ 12.  As to the seller, ABD completed the Seller's Paperwork by
filling in information specific to the Cribb transaction; called
(a conman posing as) Roy Pence on at least one occasion; and, on
May 30, 2008, emailed the Seller's Paperwork to
"penceroy@yahoo.com" (an address provided by the Conmen)
requesting the seller to sign and return the Seller's Paperwork
and send the original Certificate of Documentation to ABD.
[Document 195-14].  Thereafter, ABD received a letter dated June
2, 2008, purportedly from Roy Pence, which stated that the
seller had executed the Seller's Paperwork and explained "[a]s I
discussed with you today on the telephone, I will send my
original Coast Guard Certificate [of Documentation] following
completion of the funding."[16]  [Document 190-1].  No Certificate

---

[16]    Relying on the affidavit of Elizabeth Childs, ABD contends
it forwarded the June 2, 2008 letter to Chesapeake.  However,

of Documentation was ever produced to ABD, Chesapeake, or Wells Fargo.[17]

### 3. <u>Loan Consummation and Aftermaths</u>

On May 30, 2008, Chesapeake sent the promissory note, security agreements, and the Buyer's Paperwork (including the First Preferred Ship Mortgage) to a Chicago office address

---

Chesapeake denies that it received the letter.

[17] Vorce testified at his deposition that he "think[s] there were multiple phone calls" concerning the Certificate of Documentation from ABD and:

> A: Well, the original request was made by Liz. I can't speak for - - I personally spoke with Carrie at least twice because Liz, I don't know if she was out of the office, she was unreachable and it seemed like she had delegated getting the final papers to Carrie, and so Carrie was handling that. It's my recollection, you know, we stalled on the certificate. I don't - - to my recollection, we were in Chicago right now, down in Florida, we don't have it, and we said this is, you know, this is going to really – if we can't close – if we can't close this deal, this is going to basically jeopardize the whole transaction, and we basically made it their concern, turned it around and made it Atlantic Bond [sic] Documentation's concern, put the pressure on them.
>
> Q: To do what?
>
> A: To make an exception.
>
> Q: To filing the Coast Guard –
>
> A: To make an exception for needing that certificate.

Vorce Dep. June 22, 2010 [Document 190-11] at 156-57.

provided by the Conmen.  The Conmen executed the documents using a forged signature for Cribb and returned them to Chesapeake.  Chesapeake then received a fax purportedly from Roy Pence instructing Chesapeake to wire the proceeds of the boat loan to a specified E*TRADE bank account in Chicago.

On June 5, 2008, Chesapeake submitted to Wells Fargo the Closing Package, containing the promissory note, First Preferred Ship Mortgage, related security agreements, and a copy of what purported to be Victor Cribb's driver's license created by Vorce, using a fictitious license number.  On June 6, 2008, upon receipt of the Closing Package, Wells Fargo faxed a message to Chesapeake stating it did not have the Yacht Purchase and Sale Agreement.  Chesapeake asked (a conman posing as) Cribb, for the agreement and "Cribb" provided a fake document which Chesapeake then forwarded to Wells Fargo.  Thereafter, Wells Fargo funded the loan by wiring $884,900 to Chesapeake's bank account.

On June 6, 2008, Chesapeake provided the executed Buyer's Paperwork to ABD as well as the executed promissory note and related security agreements.  ABD used the promissory note and security agreements to complete the First Preferred Ship Mortgage.  On June 10, 2008, ABD filed a package of documents with the Coast Guard.  For documenting the Cribb Transaction, ABD received $495.00, which included the Coast Guard recordation fee of $112.  No Certificate of Documentation for the Faithful

was filed with the Coast Guard.  According to the Abstract of Title issued by the Coast Guard for the Faithful after completion of the Cribb transaction, the Coast Guard recorded the First Preferred Ship Mortgage for the Faithful and related documents, reflecting Wells Fargo's lien.

On June 9, 2008, Chesapeake wired the loan proceeds to the E*TRADE bank account in Chicago as instructed by (a conman posing) as Roy Pence.  The loan proceeds travelled a circuitous route, ending up as gold coins delivered to Vorce in Wisconsin. Vorce thereafter sold the gold coins and the proceeds of that sale do not now appear to be recoverable.

On June 26, 2008, the real JRP Marine, having become aware of the cloud on the title of the Faithful, alerted the Coast Guard of the fraud.  To clear the title for JRP Marine, Wells Fargo filed a release of the fraudulently issued First Preferred Ship Mortgage in its favor.

On September 17, 2008, Wells Fargo filed the instant lawsuit seeking to recoup its losses.


III. PROCEDURAL SETTING

In the Second Amended Complaint [Document 61], Wells Fargo presents its claims in seven Counts.

> Count I:       Breach of Contract against
>                Chesapeake;

|            |                              |
|------------|------------------------------|
| Count II:  | Negligence against Chesapeake; |
| Count III: | Breach of Contract against Chesapeake as Guarantor; |
| Count IV:  | Breach of Contract against Philip Colonna as Guarantor; |
| Count V:   | Negligence and Fiduciary Duty against ABD; |
| Count VI:  | Civil RICO against Chesapeake, Jack Doe, and John Doe; and |
| Count VII: | RICO Conspiracy against Chesapeake, Jack Doe, and John Doe. |

In their Answer, [Document 63] Chesapeake and Colonna present six cross and third-party claims:

|            |                              |
|------------|------------------------------|
| Claim I:   | Breach of Contract against ABD; |
| Claim II:  | Contribution against ABD; |
| Claim III: | Indemnification against ABD; |
| Claim IV:  | Fraud against Vorce and Jett; |
| Claim V:   | Contribution against Vorce and Jett; and |
| Claim VI:  | Indemnification against Vorce and Jett. |

Defaults were entered against both Vorce and Jett [Documents 54, 80, 81], and a default judgment was obtained by

Wells Fargo against Vorce in the amount of $885,000 plus

interest and costs [Document 56].[18]

By the instant motions Wells Fargo, Chesapeake, Colonna,

and ABD each seek summary judgment with regard to all claims by,

or against them.


IV.   <u>SUMMARY JUDGMENT STANDARD</u>

A motion for summary judgment shall be granted if the

pleadings and supporting documents show "there is no genuine

dispute as to any material fact and the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a).

The well-established principles pertinent to summary

judgment motions can be distilled to a simple statement: The

court may look at the evidence presented in regard to a motion

for summary judgment through the non-movant's rose-colored

glasses, but must view it realistically.  After so doing, the

essential question is whether a reasonable fact finder could

return a verdict for the non-movant or whether the movant would,

at trial, be entitled to judgment as a matter of law.  <u>See,</u>

---

[18]   As of this writing, forfeiture proceedings against Vorce
are pending in <u>United States of America v. Michael Bruce Vorce</u>,
Case No. 1:08-CR-282 (W.D. Mich.) relating to the liquidation of
Vorce's stock in InelePeer, Inc. [Document 229].  This
forfeiture proceeding does not appear to be relevant to the
instant case.

e.g., <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>Shealy</u>
<u>v. Winston</u>, 929 F.2d 1009, 1012 (4th Cir. 1991).

When evaluating a motion for summary judgment, the court
must bear in mind that the "summary judgment procedure is
properly regarded not as a disfavored procedural shortcut, but
rather as an integral part of the Federal Rules as a whole,
which are designed 'to secure the just, speedy and inexpensive
determination of every action.'" <u>Celotex</u>, 477 U.S. at 327
(quoting Rule 1 of the Federal Rules of Civil Procedure).

Cross motions for summary judgment "do not automatically
empower the court to dispense with the determination whether
questions of material fact exist." <u>Lac Courte Oreilles Band of</u>
<u>Lake Superior Chippewa Indians v. Voigt</u>, 700 F.2d 341, 349 (7th
Cir. 1983). "Rather, the court must evaluate each party's
motion on its own merits, taking care in each instance to draw
all reasonable inferences against the party whose motion is
under consideration." <u>Mingus Constructors, Inc. v. United</u>
<u>States</u>, 812 F.2d 1387, 1391 (Fed. Cir. 1987). The court may
grant summary judgment in favor of one party, deny both motions,
or grant in part and deny in part each of the parties' motions.
<u>See</u> <u>Rossignol v. Voorhaar</u>, 316 F.3d 516, 523 (4th Cir. 2003).

V.   DISCUSSION

   A.   RICO Claims (Counts VI and VII)

   The Racketeer Influenced and Corrupt Organizations Act

("RICO") provides a private civil action to recover treble

damages for injury to one's business or property "by reason of a

violation" of RICO's substantive provisions.  18 U.S.C. §

1964(c).  In particular, the civil RICO statute renders it

unlawful:

          . . . [F]or any person employed by or
          associated with any enterprise engaged in,
          or the activities of which affect,
          interstate or foreign commerce, to conduct
          or participate, directly or indirectly, in
          the conduct of such enterprise's affairs
          through a pattern of racketeering activity
          or collection of unlawful debt.

Id. § 1962(c).  Section 1962(d) makes it unlawful "for any

person to conspire to violate" the provisions of § 1962(c).

   As explained by the Supreme Court, a § 1962(c) civil RICO

claim has four essential elements: (1) conduct; (2) of an

enterprise; (3) through a pattern; (4) of racketeering activity.

See Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496

(1985).  Accordingly, in order to prevail on a civil RICO claim,

a plaintiff must prove by a preponderance of the evidence that

the defendant engaged in a pattern of racketeering activity.

See generally, S. Atl. Ltd. P'ship of Tennessee, L.P. v. Riese,

284 F.3d 518, 530 (4th Cir. 2002).  Regarding a § 1962(d) RICO

conspiracy claim, a plaintiff must likewise prove by a preponderance of the evidence that the defendants conspired to violate § 1962(c).  See LaSalle Bank Lake View v. Seguban, 937 F. Supp. 1309, 1324 (N.D. Ill. 1996); Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 651 (2008).  The Fourth Circuit has explained that "'RICO treatment is reserved for conduct whose scope and persistence pose a special threat to social well-being.'" GE Inv. Private Placement Partners II v. Parker, 247 F.3d 543, 551 (4th Cir. 2001) (quoting Menasco, Inc. v. Wasserman, 886 F.2d 681, 684 (4th Cir. 1989)).

Wells Fargo has presented no evidence indicating, much less adequate to prove, that Chesapeake and/or Colonna[19] could be subject to any RICO claim.  Indeed, Wells Fargo cannot even suggest any plausible motive for them to have conspired to commit the fraud at issue in view of the MOA and Colonna's guaranty.  Nor is there evidence to support any RICO claim against any Doe Defendant.

---

[19]    In the Second Amended Complaint, Wells Fargo does not allege liability on part of Colonna under Counts VI and VII.  In its briefing, Wells Fargo appears to suggest that Colonna is the "Doe (Employee Conspirator)" referenced in the Complaint in those counts.  However, "Jack Doe" has been identified as Terry Cannon, a Chesapeake employee [Documents 36, 41].  Moreover, Wells Fargo stipulated to a dismissal of Terry Cannon from this case [Document 173], which the Court approved [Document 174].

Accordingly, summary judgment shall be granted in favor of Chesapeake and Colonna with regard to the claims in Counts VI and VII of the Second Amended Complaint.

B.   Breach of Contract Claims

    1.   Wells Fargo - Chesapeake (Count I)

On August 27, 2007, Wells Fargo and Chesapeake entered into the Marine Operating Agreement ("MOA") to govern their boat loan lender/broker business relationship.  In the MOA, Chesapeake made several representations and warranties to Wells Fargo as well as agreed to repurchase an "Obligation, and pay the Repurchase Price" to Wells Fargo "if any representation or warranty made by [Chesapeake] to [Wells Fargo] with respect to an Obligation is false or misleading in any material respect" (the "Repurchase Obligation").  MOA § C, F(7)(a).

Wells Fargo asserts that with respect to the Cribb transaction, Chesapeake made certain representations required by the MOA that were false or misleading in a material respect and failed to satisfy the Repurchase Obligation upon demand.

a.  <u>Legal Principles</u>

Under North Carolina Law,[20] in an action for breach of contract the plaintiff carries the burden to prove that "a contract existed, the specific provisions breached, the facts constituting the breach and the amount of damages resulting to plaintiff from such breach." <u>Harrington v. Perry</u>, 406 S.E.2d 1, 2 (N.C. Ct. App. 1991).  Concerning interpretation of the terms used in a contractual agreement, "the generally accepted rule is that the intention of the parties controls, and the intention can usually be determined by considering the subject matter of the contract, language employed, the objective sought and the situation of the parties at the time when the agreement was reached." <u>Robertson v. Hartman</u>, 368 S.E.2d 199, 200 (N.C. Ct. App. 1988).

"'If the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract.'" <u>State v. Philip Morris USA Inc.</u>, 669 S.E.2d 753, 755 (N.C. Ct. App. 2008), <u>aff'd</u>, 685 S.E.2d 85 (N.C. 2009) (quoting <u>Walton v. City of Raleigh</u>, 467 S.E.2d 410, 411 (N.C. 1996)).  Stated differently, if the language of a contract is clear and only one reasonable interpretation exists, the court

---

[20]    Section F(4) of the MOA provides "[t]his Agreement shall be governed by the laws of the state of North Carolina."  Wells Fargo and C&C agree that the MOA is governed by North Carolina law.  <u>See</u> C&C Opp'n [Document 129] at 18; Wells Fargo Reply [Document 134] at 3 n.1.

"must enforce the contract as written and cannot, under the guise of interpretation, rewrite the contract or impose terms on the parties not bargained for and found within the contract." Crider v. Jones Island Club, Inc., 554 S.E.2d 863, 866 (N.C. Ct. App. 2001) (internal quotations omitted). However, if the contract is ambiguous, interpretation is a question of fact and "resort to extrinsic evidence is necessary." Id. An ambiguity exists where the "language of a contract is fairly and reasonably susceptible to either of the constructions asserted by the parties." Glover v. First Union Nat'l Bank, 428 S.E.2d 206, 209 (N.C. Ct. App. 1993). Whether the language of a contract is ambiguous is a question of law determined by the court. Salvaggio v. New Breed Transfer Corp., 564 S.E.2d 641, 643 (N.C. Ct. App. 2002).

b.  The Representation Violation

By the instant motion, Wells Fargo seeks summary judgment with regard to seven[21] representations and warranties (collectively, the "Representations") required by the MOA:

---

[21]  In the briefing on the instant motion, Wells Fargo contends that Chesapeake violated representation requirements that were not included in the Second Amended Complaint – the Ownership Representation, the Delivery Representation, and the Payment Representation.  These contentions are not relevant to any claim presented by the Second Amended Complaint and are not addressed herein.

- 3(a)[22] ("Legally Enforceable");
- 3(b) ("Down Payment");
- 3(c) ("Ownership");
- 3(e) ("Perfection");
- 3(f) ("Delivery");
- 3(g) ("Payment"); and
- 4(b) ("Indemnity")

However, it is necessary to address only the first of these Representations.

Section 3(a) of the MOA provides in pertinent part:

> As to each Obligation submitted to [Wells Fargo], [Chesapeake], at the time of submission, **represents and warrants that**:
>
> (a) All information and amounts shown on the Obligation and on all other documents submitted in connection therewith are true and correct to the best of [Chesapeake's] knowledge and belief, and **documents evidencing and securing the Obligations, which are delivered to [Wells Fargo], represent the complete agreement concerning the loan and are legally enforceable according to their terms, and the persons executing the documents, whether Maker, guarantor, or otherwise, were legally competent to do so.**

(emphasis added to indicate the portion of the provision on which Wells Fargo bases its claim).

There is no doubt that the documents evidencing and securing the "Obligation," including the First Preferred Ship Mortgage, promissory note, and related security agreements, were

---

[22] Reference is to Section C of the MOA.

delivered to Wells Fargo by Chesapeake. Moreover, there is no dispute that these documents are not legally enforceable according to their terms since the documents were fraudulently executed by Vorce and Jett and JRP Marine and Cribb never entered into any agreement for the sale of the Faithful capable of giving rise to an enforceable lien held by Wells Fargo in the Faithful. Further, it is undisputed that the persons executing these documents (Vorce and Jett) were not legally competent to do so for the same reasons. Accordingly, the Legally Enforceable Representation made by Chesapeake to Wells Fargo as to the Cribb transaction is completely, and thus materially, false.

Chesapeake asserts that the Legally Enforceable Representation is not a strict liability warranty because it is qualified by the phrase "to the best of [Chesapeake's] knowledge and belief." The Court finds this contention to be unpersuasive.

When interpreting contract language, the presumption is that the parties intended what the language used clearly expresses, and the contract must be construed to mean what on its face it purports to mean. Integon Nat. Ins. Co. v. Phillips, 712 S.E.2d 381, 383 (N.C. Ct. App. 2011). A plain reading of § 3(a) demonstrates that the term "knowledge and belief" does not qualify the entirety of the Representation in

that section.  The comma after "knowledge and belief" and before "and" signifies that the Legally Enforceable Representation requirement is not modified by the "knowledge and belief" language following the "true and correct" requirement.  <u>See</u> <u>Novant Health, Inc. v. Aetna U.S. Healthcare of Carolinas, Inc.</u>, 98 CVS 12661, 2001 WL 34054420, at *4-5 (N.C. Super. Mar. 8, 2001)(explaining rules governing grammar may be used as an aid to interpreting written instruments where such application is logical in connection with basic rules governing contract construction).  As discussed herein, this construction is logical and consistent with other applicable rules governing contract interpretation.

Chesapeake contends such an interpretation of § 3(a) is unreasonable because it obligates Chesapeake, not a law firm, to warrant the fulfillment of legal concepts.  The Court does not agree.  The representations and warranties made by Chesapeake in the MOA involve numerous "legal concepts" relevant to the boat loan business such as title, security interest, and perfection. Furthermore, Chesapeake expressly warranted in § 3(d) that the execution "of the documentation related to each Obligation and the performance thereof shall comply with the laws of the state where executed and performed . . . ."

As two commercial entities, Chesapeake and Wells Fargo were free to enter into a mutual agreement placing the risk of legal infirmities in boat loan documents, including fraud either by the true buyer or seller or third parties, upon Chesapeake, the party referring the loan applicant to Wells Fargo. Cf. UniCredito Italiano SPA v. JPMorgan Chase Bank, 288 F. Supp. 2d 485, 498-99 (S.D.N.Y. 2003) (dismissing fraud and negligent misrepresentation claims where contracts at issue contained provisions that defendant bank had no duty to ascertain borrower's performance of terms of any instrument and warranted only that it was the beneficial owner of the interest being sold). As shown by the unambiguous language of the Legally Enforceable Representation, Chesapeake and Wells Fargo did so.

Further, the Court finds any assertion that Colonna, Chesapeake's principal, did not understand or read the terms of the MOA neither supported by adequate evidence nor, in any event material. Absent fraud or oppression, "parties to a contract have an affirmative duty to read and understand a written contract before signing it." Roberts v. Roberts, 618 S.E.2d 761, 764 (N.C. App. Ct. 2005) (quoting Park v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 582 S.E.2d 375, 380 (N.C. App. Ct. 2003)). There is no claim – and manifestly no evidence

supporting a claim – that Chesapeake or Colonna entered the MOA by virtue of fraud or oppression.

Accordingly, the Court holds that Wells Fargo is entitled to summary judgment establishing that the representations made by Chesapeake in the Legally Enforceable Representation of the MOA were materially false with regard to the Cribb transaction.

c.   Repurchase Obligation

The Repurchase Obligation provision, § F(7) of the MOA provides:

> 7. Repurchase
>
> (a) [Chesapeake] hereby unconditionally agrees to purchase the Obligation, and pay the Repurchase Price, as herein defined, to [Wells Fargo] on demand, whether or not the Obligation is in default, upon the occurrence of any of the following events:
>
> (i) if any representation or warranty made by [Chesapeake] to [Wells Fargo] with respect to an Obligation is false or misleading in any material respect . . .
>
> (b) "Repurchase Price" shall mean an amount equal to the entire amount of any fee paid by [Wells Fargo] to [Chesapeake], plus the unpaid balance of the debt owed under the Obligation together with all costs and expenses paid or incurred by [Wells Fargo] including, but not limited to, costs and expenses for the maintenance, repair,

> protection and preservation of the Vessel
> and all attorney's fees in connection with
> the collection of the debt and defending or
> enforcing [Wells Fargo's] rights and
> remedies in this Agreement, the Obligation
> and the Vessel.

As discussed above, Wells Fargo is entitled to summary judgment establishing that Chesapeake's Legally Enforceable Representation was materially false with regard to the Cribb transaction. Thus an event triggering the Repurchase Obligation occurred.

The explicit language of the Repurchase Obligation requires Chesapeake to purchase from Wells Fargo, on demand, the promissory note and security agreements in the Cribb transaction for "an amount equal to the entire amount of any fee paid" by Wells Fargo to Chesapeake "plus the unpaid balance of the debt owed" under the promissory note and security agreements "together with all costs and expenses paid or incurred" by Wells Fargo.

The parties agree that Wells Fargo made a demand upon Chesapeake to satisfy the Repurchase Obligation for the Cribb transaction and Chesapeake did not comply with the demand.

Chesapeake contends that the Repurchase Obligation is not triggered when the triggering event is caused by third-party fraud because damages resulting from third party fraud were not

contemplated by the parties under the MOA. The Court finds that contention unpersuasive. Plainly, fraud by a person purporting to be the buyer/mortgagor or seller can render a promissory note or security agreement unenforceable. <u>See generally</u> <u>Hardin v. KCS Int'l, Inc.</u>, 682 S.E.2d 726, 733 (N.C. Ct. App. 2009); <u>Faller v. Faller</u>, 233 A.2d 807, 809 (Md. 1967). The MOA does not set forth an exclusive list of reasons causing a document to be legally unenforceable or a person executing a document not to be legally competent that would trigger the Repurchase Obligation. Obviously, there could be a myriad of reasons ranging from inadvertence to negligence to third-party fraud and, indeed, to fraud by the broker. Nevertheless, the Legally Enforceable Representation requirement unambiguously[23] placed the

---

[23]    Chesapeake asserts it is entitled to summary judgment on Count I because Wells Fargo did not provide expert testimony to address ambiguities in the MOA. Where the Court has not found the MOA to be ambiguous, this argument is moot. Nor do the cases cited by Chesapeake support its position that such expert testimony is necessary. <u>See</u> <u>Schultz v. Bank of Am., N.A.</u>, 990 A.2d 1078, 1093-94 (Md. 2010) (finding trial court erred in putting breach of contract claim before jury where commercial code established contractual obligation of bank to exercise ordinary care but plaintiff "failed to present any testimony, including expert testimony, establishing the extent of the obligation created by the duty of ordinary care" so that jury could not have known what obligation the bank allegedly breached); <u>Associated Indus. Contractors, Inc. v. Fleming Eng'g, Inc.</u>, 590 S.E.2d 866, 871 (N.C. Ct. App. 2004) <u>aff'd</u>, 608 S.E.2d 757 (N.C. 2005) (finding expert testimony not necessary to establish standard of care in professional negligence claim where surveyor's actions were in the common knowledge of lay persons).

risk that loan documents, such as a promissory note or security agreement, were unenforceable – regardless of the reason - on Chesapeake. The Repurchase Obligation provides Wells Fargo with a remedy, and Chesapeake an obligation, in such a situation.

The Court finds no ambiguity and shall grant summary judgment to Wells Fargo establishing that Chesapeake breached the MOA by failing to comply with the Repurchase Obligation.

### d. Damages

In Count I, Wells Fargo seeks damages in the amount of "$885,000 [the outstanding principal loan amount], plus fees paid, including without limitation dealer reserve fees of $13,275.00, plus interest, costs and attorney's fees." Sec. Am. Compl. ¶ 40.

Chesapeake contends Wells Fargo is not entitled to the damages sought under the MOA because such damages are not related to any action or inaction on the part of Chesapeake and/or the Repurchase Obligation is an unenforceable penalty.

### i. Causation

In an action for breach of contract, the plaintiff bears the burden of proving that the amount of his claimed damages

resulted from the defendant's breach.  See Harrington v. Perry,
406 S.E.2d 1, 2 (N.C. Ct. App. 1991).  In particular, a
plaintiff is entitled to recover damages only for those injuries
that are "'the direct, natural, and proximate result of the
breach or which, in the ordinary course of events, would likely
result from a breach and can reasonably be said to have been
foreseen, contemplated, or expected by the parties at the time
when they made the contract as a probable or natural result of a
breach.'"  Bloch v. The Paul Revere Life Ins. Co., 547 S.E.2d
51, 58 (N.C. App. Ct. 2001) (quoting Lamm v. Shingleton, 55
S.E.2d 810, 812-13 (N.C. 1949)).

     Chesapeake contends that Wells Fargo's claimed damages are
unrelated to any breach of the Representations.  This argument,
at best, borders on the frivolous.  The loss to Wells Fargo is
directly related to the unenforceability of the loan agreement
due to the fraudulent nature of the operative documents.
Further, Wells Fargo's damages directly flow from the Repurchase
Obligation that Chesapeake failed to satisfy.

     The cases relied upon by Chesapeake do not involve
contracts containing repurchase obligation provisions.  See
Bloch, 547 S.E.2d at 58 (reversing denial of  defendants motion
for directed verdict in breach of employment contract case where
jury awarded plaintiff lost earnings for 15 years beyond the

34

lawful termination of employment contract, which could be terminated with 30 days' notice without cause); <u>Crowley Am. Transp., Inc. v. Richard Sewing Mach. Co.</u>, 172 F.3d 781, 784-85 (11th Cir. 1999)(upholding award of summary judgment to carrier on shipper's breach of contract claim where damage to cargo while in possession of third party was not proximately caused by carrier's immaterial breach in failing to notify bank of cargo's arrival); <u>Petitt v. Celebrity Cruises, Inc.</u>, 153 F. Supp. 2d 240, 263 (S.D.N.Y. 2001) (dismissing breach of contract claim where no evidence a contract existed and plaintiffs failed to raise an issue of material fact that would enable a reasonable jury to conclude their illnesses on cruise were the result of action of cruise liner defendant).

Thus, Chesapeake does not have a viable defense based on its causation contention.


## ii. <u>Illegal Penalty</u>

Chesapeake contends that the Repurchase Obligation is a liquidated damage provision and constitutes an unenforceable penalty under North Carolina law. To address this contention, the Court will assume, without deciding, that the Repurchase Obligation is properly categorized as a liquidated damage provision.

"Under the fundamental principle of freedom of contract, the parties to a contract have a broad right to stipulate in their agreement the amount of damages recoverable in the event of a breach, and the courts will generally enforce such an agreement."  Seven Seventeen HB Charlotte Corp. v. Shrine Bowl of the Carolinas, Inc., 641 S.E.2d 711, 713 (N.C. Ct. App. 2007) (quoting 24 Richard A. Lord, Williston on Contracts § 65:1, 213 (4th ed. 2002)) (finding defendant challenging damage provision had the burden to show unenforceability).  However, a liquidated damage clause is unenforceable if it constitutes an unreasonable penalty.  Naik v. HR Providence Rd., LLC, 190 N.C. App. 822 (2008) (unpublished).  A penalty is a stipulated damage provision that is fixed as a punishment, "the threat of which is designed to prevent the breach of the agreement."  Knutton v. Cofield, 160 S.E.2d 29, 34 (N.C. 1968) (finding damage provision in contract was not an illegal penalty).

As discussed herein, the Repurchase Obligation permits Wells Fargo to demand that Chesapeake step into its shoes as lender/mortgagee when Chesapeake's representations and warranties as to a particular "Obligation" are "false or misleading in any material respect."  MOA § F(7)(a).  Liquidated damage clauses that are reasonable in amount are enforceable as part of a contract and are not seen as penalty clauses.  E.

Carolina Internal Med., P.A. v. Faidas, 564 S.E.2d 53, 56 (N.C. App. Ct. 2002) aff'd, 572 S.E.2d 780 (N.C. 2002). The Repurchase Obligation requires Chesapeake to purchase the promissory note and related security agreements from Wells Fargo for a particular transaction for the total of the fee paid to Chesapeake by Wells Fargo in the transaction, the unpaid balance of the debt owed under the promissory note, and fees and expenses incurred by Wells Fargo. Chesapeake provides no evidence that the amount required to be paid to Wells Fargo under the Repurchase Obligation is unreasonable, acts as a punishment, or was designed to prevent a breach of the MOA.[24] Further, repurchase provisions in loan-broker agreements triggered by violations of warranties have been enforced by other courts. See Flagstar Bank v. Premier Lending Corp., 295211, 2011 WL 1086558, at *4 (Mich. Ct. App. Mar. 24, 2011) (unpublished) (per curiam).

---

[24] Chesapeake contends the Repurchase Obligation is a penalty because it is triggered by any warranty or representation being false in a material respect, despite the amount of actual damages caused by such falsity. However, the "general rule is that the amount stipulated in a contract as liquidated damages for a breach, if not a penalty, may be recovered in the event of a breach even though no actual damages are suffered." E. Carolina Internal Med., P.A. v. Faidas, 564 S.E.2d 53, 56 (N.C. App. Ct. 2002), aff'd, 572 S.E.2d 780 (N.C. 2002).

Accordingly, the Court finds that the Repurchase Obligation does not operate as an illegal penalty under North Carolina law. Thus, the "illegal penalty" defense is unavailing.


e.   Equitable Estoppel

As the invoking party, Chesapeake bears the burden of proof on its affirmative defense of equitable estoppel. State Farm Mut. Auto. Ins. Co. v. Atl. Indem. Co., 468 S.E.2d 570, 574-75 (N.C. Ct. App. 1996).

Under North Carolina law, to establish a claim of equitable estoppel, the following elements must be met:

> (1) The conduct to be estopped must amount to false representation or concealment of material fact or at least which is reasonably calculated to convey the impression that the facts are other than, and inconsistent with, those which the party afterwards attempted to assert;
>
> (2) Intention or expectation of the party being estopped that such conduct shall be acted upon by the other party or conduct which at least is calculated to induce a reasonably prudent person to believe such conduct was intended or expected to be relied and acted upon;
>
> (3) Knowledge, actual or constructive, of the real facts by the party being estopped;
>
> (4) Lack of knowledge of the truth as to the facts in question by the party claiming estoppel;

> (5) Reliance on the part of the party
> claiming estoppel upon the conduct of the
> party sought to be estopped; and
>
> (6) Action by the party claiming estoppel
> based thereon of such a character as to
> change his position prejudicially.

Crisp v. E. Mortg. Inv. Co., 632 S.E.2d 814, 816 (N.C. Ct. App. 2006); Keech v. Hendricks, 540 S.E.2d 71, 74-75 (N.C. Ct. App. 2000). If the evidence raises a permissible inference that the elements of equitable estoppel are present, estoppel is a question of fact for the jury. See Keech, 540 S.E.2d at 75.

In its Reply, C&C present a footnote stating: "[b]y prematurely releasing its interest in the collateral, without notice to Chesapeake or securing its consent, [Wells Fargo] is now estopped from demanding that Chesapeake purchase the obligation." [Document 202] (sealed) at 22, n.13.

The Court finds that neither C&C's or Wells Fargo's motions include a request for summary judgment with regard to the affirmative defense of equitable estoppel. Inasmuch as the defense was pleaded, the Court will not find waiver. Thus the defense remains pending.

## 2. Wells Fargo - Chesapeake (Guarantor) (Count III)

The MOA provides, in § C(4)(b):

> If [Chesapeake] uses a boat documentation service company to document the Vessel as described above, and the documentation service company and/or its insurance does not fully protect [Wells Fargo] against any and all loss due to an error or omission of the documentation service provider in documenting the Vessel, [Chesapeake] agrees to indemnify and hold [Wells Fargo] harmless from and against any and all claims, losses, damages, legal fees and related costs, fees and expenses [Wells Fargo] may sustain as a result of the failure of the boat documentation service company to perform its obligations.

In Count III, Wells Fargo alleges that ABD "failed to perfect the security interest" in the Faithful, Wells Fargo has been damaged in the amount of "$885,000 plus interest, dealer reserve fees of $13,275.00, costs and attorney's fees," and pursuant to § C(4)(b), Chesapeake must indemnify Wells Fargo for such damages. Sec. Am. Compl. ¶¶ 57-59. Wells Fargo seeks summary judgment on Count III.

At the hearing, Chesapeake stated that it does not deny liability or a duty to indemnify Wells Fargo under § C(4)(b), but maintains that because ABD is adequately insured this section is not at issue.

Accordingly, the Court finds that Wells Fargo is entitled to summary judgment establishing that Chesapeake has a

contractual obligation to indemnify Wells Fargo if ABD and/or

its insurance does not fully protect Wells Fargo with regard to

losses caused by an "an error or omission of [ABD] in

documenting" the Faithful as provided in § C(4)(b) of the MOA.


3.    <u>Wells Fargo – Colonna (Guarantor) (Count IV)</u>

The MOA provides in § F(16)

> This Agreement includes the Personal
> Guaranty of Philip Colonna [hereinafter
> "GUARANTOR") as provided below. The parties
> to this Agreement hereby agree that
> [Chesapeake] and GUARANTOR shall be jointly
> and severally liable for all obligations,
> representations and warranties of
> [Chesapeake] that are created under this
> Agreement . . .

Colonna signed the MOA as "guarantor" under the following

provision entitled "personal guaranty":

> The undersigned GUARANTOR, Philip Colona –,
> as a principle owner/investor of the
> [Chesapeake] party to this Agreement, in
> order to induce [Wells Fargo] to enter into
> this Agreement, hereby directly,
> individually and personally guarantees the
> full, complete and timely performance of
> each and every duty, responsibility and
> obligation of [Chesapeake] with respect to
> the Agreement, specifically including
> without limitation the validity of
> representations and warranties, all vessel
> documentation responsibilities, and the
> repurchase and indemnification provisions of
> Section F(7) and (8) of the Agreement.

MOA, at 10-11.

Wells Fargo demanded payment on Colonna under the MOA with respect to the Cribb transaction through a letter dated July 10, 2008, and Colonna failed to tender payment.  Sec. Am. Compl. ¶ 63.

Wells Fargo seeks summary judgment on Count IV that Colonna, pursuant to the guaranty, personally and individually guaranteed the performance of the MOA and thus breached the MOA to the same extent as Chesapeake thereby rendering Colonna jointly and severally liable with Chesapeake for the damages arising therefrom.  C&C does not respond to this contention.

Based on the plain language of the MOA, the Court finds that Wells Fargo is entitled to summary judgment on Count IV, establishing that Colonna, as Guarantor, is jointly and severally liable with Chesapeake for such amount as Wells Fargo may be entitled to recover from Chesapeake in the instant case.


        4.    Chesapeake - ABD (Claim I)

In its Third Party Complaint, Chesapeake alleges ABD materially breached the parties' oral agreement for ABD to "handle all matters relating to the proper documentation of the transfer of title" of the Faithful in the Cribb transaction, including "obtaining an Abstract of Title from the U.S. Coast

Guard, documenting the vessel with the U.S. Coast Guard,

verifying the identities of all persons involved in the

transaction involving the vessel, and perfecting and obtaining a

mortgage on the vessel in [Wells Fargo's] name."  C&C's Cross &

Third Party Claims [Document 63] ¶ 14.  Chesapeake claims that

ABD prepared and obtained documents from the "seller" and

"buyer" in the Cribb transaction, including a First Preferred

Ship Mortgage and Bill of Sale, "without verifying identities

and/or that said information was true and correct, when, upon

information and belief, it was not" and as a result ABD breached

its oral agreement with Chesapeake because ABD, "did not perfect

the mortgage such that [Wells Fargo] had or has an enforceable

interest in the 'Faithful.'"  <u>Id.</u> ¶ 18.

ABD contends it is entitled to summary judgment on

Chesapeake's breach of contract claim because

> There is no evidence that there was an
> express oral agreement between Chesapeake
> and [ABD] that [ABD] would go behind the
> signatures of the buyer and seller to verify
> that there was no identity fraud or
> otherwise verify the identity of the parties
> to the transaction, some of which were
> notarized documents.

ABD's Summ. J. [Document 183] at 12.

Chesapeake asserts material disputes of fact exist as to

the terms of its oral agreement with ABD for boat documentation

43

services because there is evidence in the record from which a reasonable jury could find that ABD agreed to "properly perfect" a lender's interest in the collateral/boat, including "mak[ing] sure the person or entity selling the boat was who it indicated it was, the collateral was what it was represented to be, and there were no superior liens." C&C's Opp'n [Document 190] at 4-5.[25] Additionally, Chesapeake asserts there is evidence in the record sufficient to create a jury issue that ABD promised to, inter alia, obtain the Certificate of Documentation from the seller, either as an independent promise or as part of verifying the identity of the seller and the existence of the collateral.

Because Chesapeake is the non-moving party who will bear the burden of proof at trial on its breach of contract claim, Chesapeake must designate specific evidence showing there is a genuine issue for trial to overcome summary judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Although the Court must draw all reasonable inferences in favor of Chesapeake, the evidence presented must be more than "merely colorable." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

---

[25] In the Third Party Complaint, Chesapeake alleges an obligation to verify the identity of the buyer and seller on part of ABD. However, in its Opposition to ABD's Motion for Summary Judgment, Chesapeake points only to evidence pertinent to a verification obligation in connection with the seller or the collateral.

a.   Pertinent Legal Principles

Under Maryland law oral contracts or agreements are
generally enforceable unless enforcement is barred by the
Maryland Statute of Frauds.[26]  See Campbell v. Indymac Bank, FSB,
CIV. A. CCB-09-3182, 2010 WL 419387, at *2 (D. Md. Jan. 29,
2010). "Whether oral or written, a contract is not enforceable
unless it expresses with definiteness and certainty the nature
and extent of the parties' obligations and the essential terms
of the agreement."  Maslow v. Vanguri, 896 A.2d 408, 422 (Md.
Ct. Spec. App. 2006).

The construction of an undisputed oral contract is a
question of law. Ramlall v. MobilePro Corp., 30 A.3d 1003, 1014
(Md. Ct. Spec. App. 2011).  However, "where the terms of an oral
contract are in dispute, the finder of fact must decide what
terms were actually agreed upon by the parties." Id. "[W]here
there is some conflict in the testimony as to just what language
was used by the contracting parties in making an oral contract,
the construction placed upon the terms and conditions of the

_____

[26]   Under Md. Code, Cts. & Jud. Proc., § 5-901(3), an action
may not be brought "[o]n any agreement that is not to be
performed within 1 year from the making of the agreement,"
unless either the contract, agreement, or "some memorandum or
note of it, is in writing and signed by the party to be charged
or another person lawfully authorized by that party."  Neither
party asserts ABD's agreement to provide boat documentation
services in the Cribb transaction was not to be performed within
one year from its making.

contract by the parties themselves may be shown and is important." Serv. Realty Co. v. Luntz, 123 A.2d 201, 205 (Md. 1956); see also Son v. Margolius, Mallios, Davis, Rider & Tomar, 689 A.2d 645, 656 (Md. Ct. Spec. App. 1997), rev'd on other grounds, 709 A.2d 112 (Md. 1998) ("[W]hen parties disagree as to the existence or terms of an oral agreement, their conduct and intentions may be employed to determine any ambiguous and unknown provisions of the contract.").


b.    The Oral Agreement

It is undisputed that in 2008 Chesapeake and ABD maintained an ongoing relationship whereby, when requested, ABD would perform boat documentation services for Chesapeake in exchange for a fee.  However, ABD and Chesapeake did not have a written agreement that governed the scope of ABD's "boat documentation services."  See Childs Aff. ¶ 3.  ABD's boat documentation services admittedly included preparing and filing certain paperwork with the Coast Guard in order to effectuate the "redocumentation" of a boat in light of a change in ownership and recordation of the materials necessary to perfect a preferred ship mortgage.  See generally id.  It is further undisputed that, as to the Cribb transaction, Chesapeake requested boat documentation services from ABD, ABD performed certain services (as detailed in supra § I.C.2) that resulted in

46

ABD filing and the Coast Guard recording, _inter alia_, the First Preferred Ship Mortgage.  Chesapeake paid ABD $495 in exchange for its services in the Cribb transaction, which included the $112 recordation fee ABD ultimately paid to the Coast Guard, netting $383 to ABD.  Hence, there is no material dispute of fact that Chesapeake and ABD entered into an oral agreement for ABD to provide boat documentation services in the Cribb transaction in exchange for $383, plus the recordation fee.

The parties' dispute centers around whether the evidence in the record is capable of creating a jury issue as to the terms of the oral agreement for boat documentation services in the Cribb transaction.  That is, was there an obligation on part of ABD to ensure that Wells Fargo held a lien capable of perfection (the "verification obligation") and/or to obtain the Certificate of Documentation from the "seller" (the "COD obligation").

c.  Evidence Relied on by Chesapeake

Chesapeake relies on the following evidence to show a material dispute of fact as to whether ABD orally agreed to the verification and COD obligations: (1) Colonna's deposition testimony; (2) actions admittedly taken by ABD in boat documentation transactions; (3) actions admittedly taken by ABD in the Crib transaction; (4) requests to the "seller" by ABD for

the Certificate of Documentation in the Cribb transaction; (5)
deposition testimony of Vorce; and (6) the nature of a
Certificate of Documentation as potential proof of ownership of
a vessel.  The Court shall review the evidence submitted by
Chesapeake as to each obligation, though certain of the evidence
is overlapping.


i.  <u>Verification</u>

At his deposition, Colonna testified that as part of its
boat documentation services, ABD would call the seller and
seller's broker to get information related to the boat
transaction and Colonna understood that ABD "would do some form
of a check on the information that the seller was providing
them."[27]  Colonna Dep. Aug. 3, 2010 at 242:17-243:19.  Colonna
further testified that he got this understanding from:

---

[27]    Specifically, Colonna testified:

> Q. Now going back to the onset of the
> relationship.  If I understand what you were
> saying, you would call Atlantic Boat and
> they in turn would call the seller and the
> boat broker; is that what you were saying?
>
> A. That's correct.
>
> Q. And that was in order to get information;
> is that correct?
>
> A. That's correct.

A. Yeah, their brochure and the way Poe[28] would explain [Poe's] services to me.

Q: Specifically what did she state?

A. That they were there to protect the bank. Also that documentation would be the way of the future.  She had told me that she had lobbied with the lenders to use strictly documentation.

. . .

Q. Now, did she state anything else?

A. Nothing relevant, no.

Q: Did she give you any details about how she would go about verifying information that she obtained from would be sellers?

A: No, she just led me to believe that that would be taken care of.

Q. And what specifically did she state that led you to that conclusion?

A. I remember specifically - - I believe she used the terms ears and eyes.

---

Q. And what information did you understand they would give?

A. Verifying the existence of the seller, the existence of the boat, doing an abstract through the Coast Guard to verify if any liens were on the boat, verifying names, addresses.

Colonna Dep. Aug. 3, 2010 at 242:17-243:10.
[28]    Poe refers to Poe Martin of ABD.  Colonna testified that he did not discuss the scope of ABD's services with anyone other than Poe Martin.  Colonna Dep. Aug. 3, 2010 at 249:02-250:2. His discussions with Poe Martin regarding the scope of ABD's services occurred years before the Cribb Transaction.  See Colonna Dep. Aug. 3, 2010 at 249:18-250:2.

> Q. And what did you understand by her using
> the terms ears and eyes?
>
> A. That meant to me that she would keep an
> ear out for suspicious things and look for
> irregularities.

Colonna Dep. Aug. 3, 2010 at 243:20-245:09.  Later in his

deposition, Colonna testified he was "led to believe" that ABD

"would verify that the seller was indeed who he said he was.

And the way they would do that was to verify through directory

assistance phone numbers, and most importantly get a copy of the

document or the original title.  It might have even been the

original of both, either/or from the seller."  Id. 252:15-

253:03.


Chesapeake also points to certain services admittedly

performed by ABD in the boat documentation process in general

and the Cribb Transaction in particular.  Specifically, as part

of its boat documentation services, ABD confirms that an entity

seller is in good corporate standing in its state of

organization.  Childs Aff. ¶ 5.  With respect to checking the

"accuracy" of certain information, Elizabeth Childs of ABD

testified as follows:


> Q. Aside from these two cases, you've been
> in the documentation business for a long
> time.    Have    you    ever    seen    documents
> presented with false information?
>
> A. Not that I can recall.

Q. Have you ever seen documents presented with inaccurate information?

A. Inaccurate?

Q. Yes, ma'am.

A. Yes.

Q. Can you give me an instance of that?

A. A hull number was presented to us that was inaccurate. You know, in many different areas where it was inaccurate.

Q. If a hull number was identified inaccurately, what steps would ABD take to correct that problem?

A. I would ask for a digital photo of the hull identification number or a pencil tracing.

Childs Dep. June 18, 2010 [Document 199-3] at 46:13-21.

Concerning the Cribb transaction, ABD confirmed the boat owner/seller entity JRP marine was in good standing in Florida, its state of organization. ABD also contacted who it thought was Roy Pence by telephone to ask where to send the Bill of Sale for signature and received confirmation during that call from "Roy Pence" that he and his wife were the two members of JRP Marine. Id. at 76:3-12.

## ii. <u>Certificate of Documentation</u>

With respect to the Certificate of Documentation, Colonna testified at his deposition as to his understanding of the scope of services ABD would perform with regard to the Certificate:

> A. That they would obtain that document, and in doing so verify that the seller was who he said he was.
>
> Q. And how did you acquire that understanding?
>
> A. By what Poe Martin told me that they would be doing for me in the very onset.
>
> Q. And did she make specific reference to the certificate of documentation?
>
> A. I believe she did - - yes, I believe she did.

Colonna Dep. Aug. 3, 2010, at 254. Colonna then explained that he understood from Poe Martin that the Coast Guard would not accept a preferred ship mortgage for recordation without the Certificate of Documentation, but he did not know if that was in fact true. <u>Id.</u> at 255-56.

The record contains evidence that ABD requested the Certificate of Documentation from who it thought was the seller in the Cribb transaction on more than one occasion. On May 30, 2008, ABD sent an email to "penceroy@yahoo.com" requesting that the seller return the "Original Certificate of Documentation" to ABD prior to settlement. [Document 190-9]. Additionally, the

"seller" sent a letter dated June 2, 2008, to ABD stating "[a]s
I discussed with you today on the telephone, I will send my
original Coast Guard Certificate following completion of the
funding." [Document 190-1].[29] Vorce also testified that ABD
verbally requested the Certificate of Documentation from him
while he was posing as Roy Pence:

> Q. So, Atlantic said to Roy Pence: "we want
> to see the certificate of documentation so
> we can make sure you actually own the boat"?
>
> A. That's right. Well, they are able to
> verify – – the primary verification comes
> when they do an abstract of title.
>
> Q. Uh-huh.
>
> A. Because, I could have your certificate
> and you could sign it over to someone else
> in the Coast Guard. They do the primary
> with the Coast Guard, and they did that.
> She explained that we verified the title and
> everything but they also need the
> certificate because – – to make sure that
> nothing has transpired since it was last
> reported to the Coast Guard and the present
> day. . . .

Vorce Dep. June 22, 2010 [Document 190-11] at 157:9-25.

Chesapeake also relies upon the import of the Certificate
of Documentation and evidence of its ability to act as proof of
ownership to corroborate the deposition testimony of Colonna and

---

[29]    There is a factual dispute over whether the June 2, 2008
letter was ever provided by ABD to Chesapeake: ABD states it
forwarded a copy of the letter to Chesapeake and Chesapeake
states the letter was not received and was not in its files.
See C&C Opp'n [Document 190] at 11-12.

Vorce.  A Certificate of Documentation is a federally regulated document issued and signed by the Coast Guard that contains information pertaining to a vessel and, unless exempt, must be carried on the vessel.  See 46 U.S.C. § 12133(a).  The information contained in a Certificate of Documentation includes the vessel's name, official number, hailing port, length, breadth, depth, place built, and the owner(s), as well as the date of issuance and expiration of the Certificate itself.  See [Document 190-10].  According to the applicable federal regulations, the purpose of a Certificate of Documentation is that it is "required for the operation of a vessel in certain trades,[30] serves as evidence of vessel nationality, and permits a vessel to be subject to preferred mortgages."  46 C.F.R. § 67.1. Certificates of Documentation are reissued or replaced annually by the Coast Guard.  See Willis Dep. Feb. 4, 2011 [Document 190-8] at 170:19-171:3.

A Certificate of Documentation becomes invalid immediately upon the change in ownership of a vessel.  46 C.F.R. § 67.167(b). According to existing federal rules, when a buyer purchases a vessel from a seller, the buyer must submit an application for

---

[30]     See generally Offshore Serv. Vessels, L.L.C. v. Surf Subsea, Inc., CIV.A. 12-1311, 2012 WL 5183557, at *11 (E.D. La. Oct. 17, 2012) (explaining that a qualified vessel may participate in the US coastwise trade only if the vessel has been issued a certificate of documentation with an endorsement for that trade).

exchange of the Certificate of Documentation to the Coast Guard along with the outstanding Certificate of Documentation. <u>See</u> <u>id.</u> § 67.167(a). ABD has submitted evidence that the requirement that an outstanding Certificate of Documentation be submitted to the Coast Guard as part of the change in ownership and obtainment of a new Certificate of Documentation "has not been enforced by the United States Coast Guard since at least 1984, even though it was not removed from the regulations." Willis Aff. [Document 183-8] ¶ 9. Mary Bacon, ABD's documentation industry expert, stated that the Coast Guard has not required the outstanding Certificate of Documentation upon transfer of boat ownership for "approximately 15 years" or beginning in 1986 (the affidavit is dated January 31, 2011). Bacon Aff. [Document 183-4] ¶ 9. Chesapeake provides no evidence contradicting these opinions.

With respect to ownership of a vessel, the reverse side of a Certificate of Documentation contains a blank form that may be utilized to transfer ownership or title of a boat by recording the transfer thereon.[31] Willis Dep., Feb. 4, 2011 [Document 204-6] at 120:17-121:2. ABD submitted evidence that as part of the boat documentation process it obtains the Abstract of Title on a

---

[31] A transfer of ownership in a boat can also be accomplished by a Bill of Sale, which – though fraudulent – was the means used in the Cribb transaction.

vessel from the Coast Guard's records, which is "relied upon in
the vessel documentation services industry as the evidence of
ownership."  Childs Aff. ¶ 5.  In support of its position that a
Certificate of Documentation can indicate ownership information
not contained in the Abstract of Title, Chesapeake points to the
testimony of Thomas Willis ("Willis"), ABD's expert and fact
witness.  Mr. Willis testified that it is possible for a
Certificate of Documentation to show, contrary to the Abstract
of Title, that someone selling a boat "doesn't own the boat
anymore" **if** the seller had previously transferred ownership of
the boat using the reverse side of the Certificate of
Documentation, instead of a Bill of Sale, within the preceding
year.  See Willis Dep. Feb. 4, 2011, 169-171.  Stated
differently, Willis testified that it is possible that
evaluating the reverse side of a Certificate of Documentation
could, under certain limited circumstances, indicate or reveal
that a purported seller no longer owns the boat being
documented.

### d.  Adequacy of the Evidence

Based on the aforementioned evidence identified by
Chesapeake, the Court must determine whether a reasonable jury
could find that ABD orally agreed to the verification and/or COD
obligations.  The Court must construe all the facts and

inferences drawn therefrom in a light most favorable to
Chesapeake, the non-moving party.  See Seabulk Offshore, Ltd. V.
Am. Home Assur. Co., 377 F.3d 408, 418 (4th Cir. 2004).


i.   Verification Obligation

Preliminary, the Court notes that Chesapeake's verification
obligation claims are vague and conclusory.  It is unclear what,
exactly, Chesapeake claims ABD agreed to do to "verify"
information related to the seller and the Faithful above and
beyond the tasks it admittedly performed in the Cribb
transaction.  See generally Patterson v. Kennedy, CIV.A. DKC-11-
2487, 2013 WL 1830132, at *6 (D. Md. Apr. 30, 2013) (recognizing
that actual injury claim was so vague that it could not
withstand summary judgment).  Chesapeake merely asserts that ABD
had to "make sure" the seller and the Faithful were what they
purported to be in order to "properly perfect" Wells Fargo's
lien in the Faithful.  These phrases mean little, if anything,
without specification of the means by which ABD agreed to
accomplish such measures.

To the extent that Chesapeake takes the position that the
verification obligation meant that ABD orally agreed to
affirmatively investigate and discover fraud in the underlying
boat sale transaction, Chesapeake has failed to point to

57

evidence from which a reasonable jury could find that ABD agreed to undertake such a responsibility as part of its boat documentation services in exchange for only $383.

ABD's role in the Cribb transaction began only after Chesapeake connected "Cribb" to Wells Fargo for financing "Cribb's" purchase of the Faithful from "JRP Marine" and Wells Fargo accepted Cribb's Credit Package. Once Chesapeake solicited ABD and provided ABD with details of the Cribb transaction, the evidence indicates that ABD confirmed, in the superficial sense, certain information related to the seller and the Faithful as part of its documentation services. For instance, ABD obtained and reviewed the Abstract of Title for the Faithful, which showed "the current title status, prior title and lien history of a vessel." See Childs Aff. ¶ 5. ABD used the Abstract of Title to complete the Buyer's and Seller's Paperwork. Id. ¶ 5-7, 11. ABD also confirmed that JRP Marine was in good corporate standing in Florida. When viewed in the light most favorable to Chesapeake, this evidence shows that ABD confirmed the accuracy of certain information, which is consistent with Colonna's testimony that ABD, as part of documenting a boat transaction, verified certain information through other documents it obtained in the ordinary course of business and/or communications with the seller or buyer.

However, evidence from which a reasonable jury could find that ABD orally agreed to "confirm" that there was documentation indicating that the person named as seller and vessel existed and that the Abstract of Title revealed no prior liens does not amount to evidence of an agreement to "confirm" that the existing person named as seller had, in fact, entered into the transaction or that other pertinent documents were genuine. The verification contention is not supported by evidence that would permit a reasonable jury to conclude that, for the sum of $383, ABD would accept responsibility to conduct an investigation of the scope necessary to verify the genuineness of the transaction documents.

In sum, ABD is entitled to summary judgment that it had no "verification obligation," as discussed herein, under its oral agreement with Chesapeake to provide boat documentation services in the Cribb transaction.

ii.  Certificate of Documentation

The evidence submitted by Chesapeake is sufficient to present a genuine issue of material fact regarding the existence of an agreement to obtain the seller's Certificate of Documentation.

ABD submitted evidence that its standard operating procedure is to request the Certificate of Documentation, but that the Certificate "was of no importance to the recordation process because the Coast Guard, as a matter of practice, did not require it to be submitted." Childs Aff. ¶ 16. ABD also provided evidence that:

- Of 283 ABD files involving Wells Fargo, 105 show ABD received the seller's Certificate of Documentation;

- Of 9 files involving Wells Fargo as the lender and Chesapeake as the broker, 3 files show ABD received the Certificate of Documentation from the seller; and

- Of the 27 files involving Chesapeake and a non-Wells Fargo lender, one shows ABD received the Certificate of Documentation.

Id. Lastly, ABD's brochure does not reference the Certificate of Documentation.

As discussed supra, Chesapeake has pointed to evidence in the record indicating that ABD promised Chesapeake it would obtain the Certificate of Documentation when documenting boats for Chesapeake. That is, Colonna testified that ABD made such a promise to him.[32] Though ABD asserts the Certificate is of no

---

[32] Although ABD asserts there are reasons not to believe Colonna, such credibility issues are traditionally reserved to the jury. See Magill v. Gulf & W. Indus., Inc., 736 F.2d 976, 979 (4th Cir. 1984) ("Summary judgment also is inappropriate if an issue depends upon the credibility of witnesses, because such credibility can best be determined after the trier of fact observes the witnesses' demeanor.").

import, it admittedly requests the document and, if received, files it.  Indeed, Chesapeake produced evidence that ABD requested the Certificate from the "seller" in the Cribb transaction on more than one occasion.  Lastly, even ABD's expert admitted that, in limited circumstances, the Certificate could include information not present in the Abstract of Title, a document ABD admittedly reviews in order to fill out pertinent paperwork.

ABD contends that the Court should disregard Colonna's deposition testimony because it is "based on a fact not in existence, e.g., the Coast Guard requires a Certificate of Documentation to be filed as a condition to recordation of ownership or of a mortgage."  ABD's Reply [Document 204] at 15-16.  The Court agrees that ABD has submitted evidence suggesting that Colonna's understanding as to <u>why</u> ABD promised to obtain the Certificate of Documentation does not coincide with the practices of the Coast Guard at that time.  Yet Colonna admitted he was not sure if the reason for obtaining the Certificate was true and, though not enforced, the applicable rules are still on the books.  In any event, it is for the jury to weigh evidence of the debated importance of the Certificate of Documentation in

the documentation process, Colonna's testimony, and the actions of ABD in the Cribb transaction.[33]

There also exists a factual dispute as to whether ABD delivered to Chesapeake a copy of the June 2, 2008 letter from Roy Pence advising that the seller would not be providing the Certificate of Documentation until after funding.  Compare Kelleher Aff. ¶¶ 3-6 (Chesapeake employee involved in Cribb transaction) (explaining she never received the June 2, 2008 letter from ABD prior to this litigation) & Colonna Aff. ¶¶ 5-6 (explaining he has no recollection of the letter being provided by ABD prior to this litigation and did not see the letter among the documents produced by Chesapeake in this litigation), with Childs Aff. ¶ 13 (stating ABD sent a copy of the letter to Chesapeake with the seller's executed Bill of Sale and Power of Attorney).

Accordingly, viewing the evidence in the light most favorable to Chesapeake, there is a genuine issue of material fact as to the COD obligation.  A reasonable jury could find in Chesapeake's favor.  Therefore, the case must proceed with

---

[33]    ABD also asserts that Colonna's testimony does not establish an enforceable contract because it is too uncertain to show a meeting of the minds. As to the COD obligation, his testimony explicitly referenced that document and a promise to obtain it.  In any event, the Court has determined there is no dispute that an agreement between Chesapeake and ABD for boat documentation services existed, the factual dispute is over whether the COD obligation was a term of that agreement.

regard to Chesapeake's claim based upon an alleged agreement for ABD to provide the Certificate of Documentation.

C.  Negligence Claims

   1.  Wells Fargo - Chesapeake (Count II)

Wells Fargo alleges that Chesapeake negligently processed or handled the Cribb loan and, as "a direct, consequent and proximate result," damaged Wells Fargo "in the amount of $885,000, plus fees, including without limitation dealer reserve fees of $13,275.00, plus interest, costs."  Sec. Am. Compl. [Document 61] ¶¶ 51-55.

Chesapeake's motion seeks summary judgment on Count II on two grounds,[34] contending that:

   1. Wells Fargo has failed to designate an expert to establish the applicable standard of care, and/or

   2. The undisputed material facts demonstrate Wells Fargo's contributory negligence.

      a.  Need For Expert Testimony

Chesapeake contends that it is entitled to judgment as matter of law on Count II because Wells Fargo has failed to

---

[34] Chesapeake has not sought summary judgment on the grounds that (1) it did not owe Wells Fargo a tort duty or (2) that the tort claim is superfluous as duplicative of the contract claim.

produce expert testimony from which a reasonable jury could determine the applicable standard of care owed by Chesapeake to Wells Fargo.  Wells Fargo claims such expert testimony is not necessary because the MOA establishes the applicable standard and/or Chesapeake's negligence is obvious.

When a plaintiff alleges negligence by a professional, "expert testimony is ordinarily necessary to establish the applicable standard of care" owed by the professional unless the negligence "so obviously deviated from the applicable standard of care that the trier of fact could appreciate the deviation without an expert's assistance." Schultz v. Bank of Am., N.A., 990 A.2d 1078, 1091 (Md. 2010) (finding expert testimony necessary where case involved internal banking procedures surrounding actions taken by bank to protect customer from fraud in connection with the addition of a name to a checking account).  "If the plaintiff presents no such evidence, the trial 'court may rule, in its general power to pass upon the sufficiency of the evidence, that there is not sufficient evidence to go to the [trier of fact].'"  Id. at 1086 (quoting Rodriguez v. Clarke, 926 A.2d 736, 755 (Md. 2007)).

i.    The MOA

Wells Fargo claims expert testimony is not necessary because the "tort in this case is in essence the negligent

performance of the obligations, which are clearly enumerated and expressed in the [MOA]." Wells Fargo provides no legal support for this proposition.

The Court will assume, for present purposes, that Chesapeake owed Wells Fargo a tort duty in regard to its performance under the MOA. However, in addition to proving a tort duty; Wells Fargo must establish the degree of care which a reasonably prudent marine broker would have exercised under the same or similar circumstances to meet that duty. See Schultz, 990 A.2d at 1093-94 (discussing duty of care imposed under Maryland commercial code); see also Associated Indus. Contractors, Inc. v. Fleming Eng'g, Inc., 590 S.E.2d 866, 870 (N.C. App. Ct. 2004) aff'd, 359 N.C. 296, 608 S.E.2d 757 (2005) ("The standard of care provides a template against which the finder of fact may measure the actual conduct of the professional."). "'Where a contractual relationship exists between the persons and at the same time a duty is imposed by or arises out of the circumstances surrounding or attending the transaction, the breach of such duty is a tort and the injured party may have his remedy by an action on the case, or he may waive the tort and sue for breach of contract.'" Blondell v. Littlepage, 991 A.2d 80, 94-95 (Md. 2010) (quoting Jacques v. First Nat. Bank of Maryland, 515 A.2d 756, 759 (Md. 1986)). However, not every responsibility contained in a contract

necessarily gives rise to a duty in tort.  See 100 Inv. Ltd.
P'ship v. Columbia Town Ctr. Title Co., 60 A.3d 1, 10 (Md.
2013).

Thus, the existence of the MOA does not eliminate Wells
Fargo's need to present expert testimony as to what a reasonably
prudent marine broker would have done to determine that a loan
application was not fraudulent.


ii.  Obvious Negligence

Under Maryland law, if "a jury can use its 'common
knowledge or experience' to recognize a breach of a duty, then
expert testimony is unnecessary to calibrate the exact standard
of care owed by the defendant." Jones v. State, 38 A.3d 333, 348
(Md. 2012) (quoting Cent. Cab Co. v. Clarke, 270 A.2d 662, 667
(Md. 1970)).  Maryland courts have found such a situation
present where an attorney failed to inform his client that he
had terminated his representation of the client, Cent. Cab Co.,
270 A.2d at 667; where a bank released the collateral of a
customer and took in substitution of that collateral a paper
writing that did no more than allow the bank to collect monies
due on the collateral, Free State Bank & Trust Co. v. Ellis, 411
A.2d 1090, 1092-93 (Md. Ct. Spec. App. 1980), and where a

dentist extracted the wrong tooth from a patient's mouth,

McClees v. Cohen, 148 A. 124 (Md. 1930).

Here, Wells Fargo contends the following acts of Chesapeake patently constitute negligence, requiring no expert testimony:

Act 1 - Failure to verify the existence of sale proceeds beyond the loan amount;

Act 2 - Failure to verify the deposit/down payment to be made by the "buyer" as provided in the Yacht Purchase and Sale Agreement had been paid;

Act 3 - Disbursing the loan proceeds to a third non-sale party without notifying Wells Fargo;

Act 4 - Failure to properly confirm the identity of the buyer before allowing him to apply for a loan with Wells Fargo;

Act 5 - Failure to properly confirm the identity of the seller before disbursing loan proceeds; and

Act 6 - Failure to identify indicia of fraud, like the absence of a selling broker or buyer's broker identified in the sales contract, and failure to inform Wells Fargo of such information prior to disbursing the loan proceeds.

Wells Fargo's Opp'n [Document 194] at 26-27.

Acts 1 and 6: It would not be obvious to an ordinary person that the failure to identify the absence of a selling or buyer's broker and/or verification of the sale proceeds

constitutes negligence.  Rather, expert testimony and, if

extant, proof of industry standards would be essential to allow

a reasonable jury to find that Chesapeake's conduct fell below

an applicable standard of care. See generally C & M Builders,

LLC v. Strub, 22 A.3d 867, 875 (Md. 2011) (relying on Schultz

and explaining evidence of industry standards may be admissible

evidence of an applicable standard of care).

Act 2:  The MOA provides for a specific representation by

Chesapeake that the borrower has "paid the specified down

payment in cash."  Moreover, there is evidence that Colonna,

acting for Chesapeake, fabricated a purported check to mislead

Wells Fargo into believing that there had been a payment of

$500,000.  A reasonable jury would not need expert testimony to

find that this action is below any reasonable standard of care

imposed on a loan broker.

Act 3:  After Wells Fargo distributed the Cribb loan

proceeds to Chesapeake, Chesapeake, upon instruction from "Roy

Pence," distributed the loan proceeds via wire to an E*TRADE

bank account in the name of Tom Olofson, apparently Mr. Pence's

investment banker.  Colonna Dep. Aug. 3, 2010 at 74.  Colonna

testified that it was unusual to disburse loan proceeds to a

non-seller.  See id.  Chesapeake did not inform Wells Fargo that

it would be disbursing the funds to someone not party to the

boat sale transaction.  A reasonable jury would not need expert

testimony to find that disbursing Wells Fargo's funds to a

person not authorized by Wells Fargo to receive the funds would

be below any reasonable standard of care.

Acts 4 and 5:  Proof of Chesapeake's failure "to properly

confirm" [properly to confirm] the identity of the buyer or

seller requires evidence establishing what should have been done

or what confirmatory actions would have been taken by a

reasonably prudent boat loan broker in a similar situation.

Since the MOA contains no explicit obligation on part of

Chesapeake to take any particular action with respect to

"confirming" the identities of the buyer and seller in a boat

loan transaction, expert testimony is needed.

Accordingly, the Court finds that Chesapeake is entitled to

summary judgment establishing that, absent expert testimony, it

is not liable on Wells Fargo's negligence claims as to Acts 1,

4, 5, and 6 but not as negligence claims based on Acts 2 and 3.

### iii.  <u>Nonobvious Negligence</u>

In its Surreply, Wells Fargo asserts that if an expert is

needed regarding its negligence claim "Defendants' questioning

of Lynn, in areas regarding the MOA and the duties enumerated

therein have opened the door to Lynn['s] providing expert testimony as to this subject, and Defendants have effectively waived their right to object." Well Fargo's Surreply [213-9] at 8. Wells Fargo designated James F. Lynn as a rebuttal expert in consumer loan origination and underwriting in connection with Chesapeake's contributory negligence defense. In his expert report and deposition testimony, Mr. Lynn provides opinions as to Wells Fargo's and Chesapeake's contractual duties under the MOA, as well as the reasonableness of Wells Fargo's actions in connection with the Cribb transaction.

The Court does not find it appropriate to hold that Chesapeake waived its right to object to Wells Fargo's use of Mr. Lynn to provide expert testimony on Chesapeake's duties under the MOA as evidence of the scope of Chesapeake's tort duty. However, the Court recognizes that Wells Fargo did not timely designate Mr. Lynn as an expert witness giving the opinions it now wishes to rely upon. Thus, while Chesapeake took Mr. Lynn's deposition, it cannot be held to have taken a full deposition including questioning regarding Well Fargo's negligence claim against Chesapeake.

Under the circumstances, the Court will permit Wells Fargo to designate Mr. Lynn as an expert witness to provide specified opinions in support of its negligence claim. Chesapeake will

then be permitted to take the deposition of Mr. Lynn relating to those opinions.  Chesapeake may, at that point, file any appropriate substantive objection to the proffered expert testimony.  However, Wells Fargo will bear Mr. Lynn's fees and expenses related to the deposition.


### iv.   Resolution

The "bottom line" is that the Court shall not grant Chesapeake partial summary judgment establishing that it is not liable on Wells Fargo's negligence claim.  However, the Court determines that, absent adequate expert testimony, Wells Fargo's negligence claim is limited to Acts 2 and 3.


### b.   Contributory Negligence

Chesapeake asserts it is entitled to summary judgment establishing its affirmative defense that Wells Fargo was contributorily negligent.

Under Maryland law, contributory negligence of a plaintiff ordinarily will bar recovery on a negligence claim.  Bd. of Cnty. Comm'rs. v. Bell Atl.-Md., 695 A.2d 171, 181 (Md. 1997). "Contributory negligence is that degree of reasonable and ordinary care that a plaintiff fails to undertake in the face of an appreciable risk which cooperates with the defendant's

negligence in bringing about the plaintiff's harm."  Id.
Generally, the contributory negligence defense presents a
question of fact for the jury.  See McQuay v. Schertle, 730 A.2d
714, 721 (Md. Ct. Spec. App. 1999).

As pertinent to the claim of contributory negligence, the
following facts are not disputed:

1. In May of 2008, Wells Fargo utilized
   "CreditRevue" in connection with
   evaluating loan applications and fraud
   detection.  CreditRevue would purchase
   a consumer credit report of a loan
   applicant and generate the applicant's
   credit score.  CreditRevue also had
   algorithms embedded into its system to
   detect potential fraudulent conditions
   or issues with a loan application.

2. Wells Fargo used CreditRevue to assess
   the "Cribb" application.

3. CreditRevue highlighted the purported
   borrower's address as "FRAUD" in red
   letters and with a red flag.  Wells
   Fargo used Zillow.com, an internet
   site, to find the address.  The website
   provided the address could not be
   located.

4. The credit report pulled by CreditRevue
   showed the purported borrower's
   birthdate as 1915, noted the social
   security number was issued prior to
   1951, and showed the borrower had an
   American Express card in 1965.

5. The borrower's application submitted by
   Chesapeake showed the birth date as
   1956.

6. The purported borrower's application showed the borrower's work phone number was the same as his cell number.

7. Regarding the flagged address, Wells Fargo asked Chesapeake to have the purported borrower produce a utility bill to verify the address. "Cribb" produced a fake utility bill and Chesapeake forwarded the bill to Wells Fargo.

8. On June 5, 2008, Chesapeake sent Wells Fargo a "Closing Package" for the Cribb loan, which included a copy of the purported borrower's driver's license. The license number was fictitious.

i. "Age" Inconsistencies

Chesapeake contends that Wells Fargo's failure to notice the discrepancies between the birth year in the credit report and the Cribb loan application (i.e., the birthdate provided in the application would mean that the government issued "Cribb" his social security number before he was born) establishes contributory negligence as a matter of law.

Wells Fargo disagrees claiming CreditRevue did not flag the age inconsistencies and Mr. Lynn, Wells Fargo's proffered rebuttal expert on consumer loan origination and consumer loan underwriting, opined that Wells Fargo's reliance on CreditRevue to flag anything warranting further investigation in the application process was compliant with industry standards in

2008.[35]  In response, Chesapeake (for the first time in its

reply) claims there is evidence showing that CreditRevue did

highlight a birth year inconsistency in a Fraud Shield Summary.

In its Surreply, Wells Fargo contends the Fraud Shield Summary

was generated after funding of the Cribb loan by Betty Ashley as

part of her fraud investigation and by using Experian Social

Search.  The Fraud Shield Summary, attached to the Reply, is

dated June 24, 2008; Wells Fargo funded the loan on June 5,

2008.  Furthermore, in her affidavit, Betty Ashley states that

---

[35]    Mr. Lynn further opined in his report that:

> From an underwriting perspective, the only
> issue with respect to age is the ability to
> contract.  Based on the information I was
> presented, it was clear to me that the loan
> applicant, Mr. Cribb, was over 18 years of
> age.  Otherwise, age is irrelevant to me
> because it is a discriminatory basis as
> defined by the Equal Credit Opportunity Act.

Lynn Expert Report at 12.

In his deposition testimony, Mr. Lynn testified:

> .  .  .  .  [T]he Credit Review system was
> widely accepted in the marketplace the best
> that I could determine and it was widely
> used.  But the point is that Wachovia had to
> rely on its system, which is normal,
> customary, standard of care in the industry,
> to identify the potential discrepancy.  The
> system did not identify the discrepancy.

Lynn Dep. Feb. 25, 2011 at 140:2-10.

she generated the Fraud Shield Summary on June 24, 2008.  Ashley
Aff. ¶ 7.

Chesapeake also contends that the evidence demonstrates
that Wells Fargo customized CreditRevue to detect age-related
inconsistencies and/or trained its underwriters to look for that
type of discrepancy in Credit Packages.[36]  In support thereof,
Chesapeake provides one page of what appears to be a power point
presentation entitled "CreditRevue Red Flags" with a bullet
point stating "Social security number issued prior to
birthdate."  Yet, as part of the fact section in its brief,
Chesapeake asserts that Wells Fargo's

> . . . Underwriting manual provides no
> instructions as to how to detect fraud, it
> just tells its underwriters what to do when
> fraud is detected . . . and [the] one
> employee [in the fraud department] did not
> routinely inform the underwriters as to what
> to look for when reviewing applications.

C&C's App'x 1 to Reply [Document 202-1] at 3.

It is readily apparent that there are genuine issues of
material fact preventing summary judgment for Chesapeake on its

---

[36]    Chesapeake relies on the deposition testimony of Mr. Lynn
to support its assertion that Wells Fargo customized its own
specifications in CreditRevue, presumably to detect age-related
inconsistencies.  However, in his deposition Mr. Lynn testified
that Wells Fargo "customized [CreditRevue] to the extent that
they required an individual with lending authority to approve
every loan."  Lynn Dep. Feb. 25, 2011 at 38:15-21.  This
deposition testimony excerpt does not support Chesapeake's
position.

contributory negligence defense based on the "age inconsistencies."

    ii.  Verification of Driver's License, Cell Phone Numbers, Address

Chesapeake asserts the following failures on part of Wells Fargo are so patently negligent that no reasonable juror could fail to find contributory negligence:

Failure 1 - To verify the authenticity of Cribb's driver's license provided with the Closing Package;

Failure 2 - To notice the cell phone and work numbers given by "Cribb" were the same; and

Failure 3 - To check other internet sites or ask for physical confirmation for "Cribb's" address (as opposed to requesting a utility bill) after CreditRevue "flagged" the address and Wells Fargo could not locate it on Zillow.com.[37]

Failure 1: Chesapeake admits the evidence shows that "Vorce had spent 11 hours mocking up the driver's license, including figuring out a way to make it seem there was a hologram on the card."  C&C's Summ. J. [Document 179-1] at 13.  A reasonable jury could, but need not, find that Wells Fargo's failure to

---

[37]   Apparently the address used in the Cribb application, 777 S. Flagstar Drive, West Palm Beach, Florida, was obtained by Vorce and Jett from Regus, a company that operates "virtual offices" and was thus not a physical address.

"authenticate" a driver's license beyond visual inspection constituted contributory negligence.

Failures 2 and 3: Mr. Lynn opined in his expert report that it was normal and customary for a lending institution like Wells Fargo to rely on a broker like Chesapeake to verify and authenticate information in loan applications and all other elements associated with the transaction. A reasonable jury could rely upon this opinion and other evidence to conclude that Wells Fargo was not contributorily negligent in relying upon Chesapeake to do the verification.

Accordingly, Chesapeake is not entitled to summary judgment establishing its affirmative defense of contributory negligence against Wells Fargo.

## 2. Wells Fargo – ABD (Count V)

In Count V, entitled "Negligence & Fiduciary Duty," Wells Fargo alleges that ABD failed to exercise reasonable care in the performance of its duties as agent for or fiduciary of Wells Fargo "by failing to review satisfactory identification from the Borrower and/or JRP Marine, LLC" and "failing to properly perfect" the First Preferred Ship Mortgage. Sec. Am. Compl. ¶¶ 69-71.

a.   <u>ABD Motion to Strike [Document 217]</u>

i. <u>Portions of Plaintiff's Reply</u>

ABD asserts Wells Fargo's Reply "is nothing more than a veiled sur-reply memorandum to [ABD's] Reply Memorandum (Document No. 205) in Support of [ABD's] Motion for Summary Judgment (Document No. 195)."  ABD filed, separately, an opposition and a reply to Wells Fargo's Opposition/Cross Motion for Summary Judgment [Documents 204, 206].  Wells Fargo then filed a reply to ABD's opposition.  The issues in all of these filings are inextricably intertwined. Therefore, it is understandable that to the extent the disputes bleed together, each contention cannot be neatly extrapolated for purposes of a reply.

Accordingly, the Court shall not strike any portion of Wells Fargo's Reply.

ii.  <u>Affidavits</u>

ABD sweepingly seeks to have the Court strike the entirety of affidavits of James Meere and Brian Murphy.  The Court finds no reason to strike the entirety of these affidavits and, in the absence of a specification as to any allegedly "strike worthy" portion, will strike no part.  To the extent the Court relies upon any part of one of these affidavits, it shall so indicate.

Therefore, ABD's Motion to Strike Portions of Plaintiff's Reply (Document 214) and to Strike the Affidavits of Meere (Document 214-1) and Murphy (Document 214-2) in their Entirety (Document 217) shall be denied.

### b.   Duty to Wells Fargo

ABD seeks summary judgment on Count V because "Wells Fargo cannot establish any facts that would give rise to an independent source of a breach of tort or fiduciary duty to sustain an action sounding in tort." ABD's Summ. J. [Document 183-1] at 11. Wells Fargo – in its cross summary judgment motion - contends the undisputed facts show that ABD "owed seven (7) independent duties to WDS. These include fiduciary, direct contract, third party beneficiary, course of dealing, ethical, statutory, and based on its marketing brochure." [Document 195] at 23. These contentions shall be addressed in turn.

### i.   Legal Principles

"[T]here can be no negligence where there is no duty that is due; for negligence is the breach of some duty that one person owes to another." Va. Ctr. & P. Ry. Co. v. Fuller, 54 A. 669, 671-72 (Md. 1903). Generally, whether a tort duty exists is a question of law, to be decided by the court. Pendleton v.

State, 921 A.2d 196, 204 (Md. 2007). A tort duty is "'an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another.'" Id. (quoting Doe v. Pharmacia & Upjohn Co., Inc., 879 A.2d 1088, 1092 (Md. 2005)). As stated by the Maryland Court of Appeals:

> In determining whether a tort duty should be recognized in a particular context, two major considerations are: the nature of the harm likely to result from a failure to exercise due care, and the relationship that exists between the parties. Where the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability. This intimate nexus is satisfied by contractual privity or its equivalent.

Jacques v. First Nat. Bank of Md., 515 A.2d 756, 759-60 (Md. 1986) (holding that bank which agreed to process loan application owed customer duty of reasonable care in processing and determination of that application).

With respect to a fiduciary duty, in a claim for money damages, Maryland does not recognize a standalone cause of action for breach of fiduciary duty. See George Wasserman & Janice Wasserman Goldsten Family LLC v. Kay, 14 A.3d 1193, 1219 (Md. Ct. Spec. App. 2011); Vinogradova v. Suntrust Bank, Inc., 875 A.2d 222, 230-31 (Md. Ct. Spec. App. 2005) (treating complaint alleging negligence and breach of fiduciary duty as

one claim for negligence alone).  However, the breach of a
fiduciary duty may give rise to a cause of action such as
negligence, fraud, or breach of contract. <u>See</u> <u>Kay</u>, 14 A.3d at
1219.

ii.  <u>Tort Duty Based on Contract-Related
     Theories (Direct Contractual Privity,
     Third Party Beneficiary, and Course of
     Dealing)</u>

Wells Fargo seeks to recover on a tort theory for the
economic loss it sustained as a result of ABD's alleged
negligence.

Where a plaintiff sustains purely economic loss due to a
defendant's negligence, Maryland law requires a showing of an
intimate nexus between plaintiff and defendant.  <u>Jacques</u>, 515
A.2d at 760 (Md. 1986) (recognizing in circumstances of case a
duty of care owed to non-customer drawer of check by bank);
<u>Chicago Title Ins. Co. v. Allfirst Bank</u>, 905 A.2d 366, 381 (Md.
2006).  As the instant case presents such a situation, the Court
must examine the relationship between Wells Fargo and ABD and
assess whether that relationship is sufficiently intimate to
justify the imposition of a tort duty.

Wells Fargo appears to take the position that ABD owed it a
duty to exercise reasonable care when documenting the Cribb
transaction based upon a direct contractual or third party

beneficiary relation between it and ABD.  There is no evidence
of a direct contractual relationship between Wells Fargo and ABD
in regard to the Cribb transaction.

Under Maryland law, an "intended third party beneficiary"
may sue on a contract he or she is not a party to, despite a
lack of privity, where the parties to the contract entered into
the agreement with the intent to confer a benefit on the
beneficiary.  See Flaherty v. Weinberg, 492 A.2d 618, 622 (Md.
1985).  Here, Wells Fargo has not asserted a breach of contract
action against ABD as an intended third party beneficiary to the
oral agreement between ABD and Chesapeake.  Rather, Wells Fargo
has asserted a direct tort cause of action against ABD.  Even
assuming arguendo that Wells Fargo was an intended third party
beneficiary of the ABD-Chesapeake oral agreement, "any status
which they might have as third-party beneficiaries under the
contract is not by itself sufficient to create a duty in tort
owed" by ABD to Wells Fargo.  See Jones v. Hyatt Ins. Agency,
Inc., 741 A.2d 1099, 1107 (Md. 1999) (holding insurance agent
owed no tort duty to automobile accident victims to procure
liability insurance for the insured even if the victims were
third-party beneficiaries of contract to procure insurance).
Thus, the Court will examine the evidence related to the
relationship between Wells Fargo and ABD in order to determine

whether the imposition of a tort duty in this situation is appropriate.

Wells Fargo points to the following evidence in support of its contention that ABD owed it a tort duty of care based upon their close relationship:

- Since 2000, ABD performed boat documentation services for recreational marine loans directly for Wells Fargo, or its related entities.[38] Childs Aff. at ¶¶ 9-10;

- ABD maintained on its computer system in digital format two template Wells Fargo documents[39] provided by Wells Fargo: (1) Preferred Ship Mortgage and (2) Irrevocable Limited Power of Attorney (collectively the "Wells Fargo Form Documents")[40];

- Through oral agreement, Chesapeake retained ABD to provide boat documentation related services as to the Cribb transaction and explicitly informed ABD on May 30, 2008, that Chesapeake was the broker and Wells Fargo was the lender in the Cribb transaction, as reflected in ABD's in-take form;

- In the Cribb transaction, ABD utilized the Wells Fargo's Form Documents, filled in portions of such documents with information particular to the Cribb transaction, and sent these documents to Chesapeake for the buyer's signature;

---

[38] Not necessarily involving Chesapeake or a boat loan broker.
[39] The documents contained Wells Fargo's name and logo in the upper left hand corner.
[40] The Limited Power of Attorney authorized ABD to, inter alia, "perform any and all acts determined to be necessary . . . or required by [Wells Fargo] or the United States Coast Guard in connection with the documentation of the Vessel and the execution, delivery, filing, and recordation of a preferred mortgage on the Vessel." [Document 195-7].

- After ABD received the purported executed versions of the Wells Fargo Form Documents as well as other documents, ABD used the Marine Note and Security Agreement and Loan Rate and Repayment Rider (provided by Chesapeake) to fill in additional terms of the First Preferred Ship Mortgage; and

- On June 10, 2008, ABD submitted the First Preferred Ship Mortgage and other documents to the Coast Guard for redocumentation.

The undisputed evidence establishes that, as of May 30, 2008, ABD knew Wells Fargo to be the lender and mortgagee in the Cribb transaction. This undisputed evidence also establishes that ABD knew properly recording the First Preferred Ship Mortgage and other documents would be highly beneficial to Wells Fargo as the lender/mortgagee. As explained in ABD's advertising materials, "Banks and other lending institutions require Documentation as it is only through the recordation of the First Preferred Ships Mortgage that a lender can protect its security interest in a vessel." [Document 195-12]. Thus, ABD reasonably knew that failure to record properly the First Preferred Ship Mortgage could harm Wells Fargo's interest, if one existed, in the Faithful. To this end, ABD knowingly acted for the benefit of Wells Fargo when it performed documentation services in the Cribb transaction and knew that Wells Fargo relied on it to protect any security interest Wells Fargo acquired in the Faithful by properly recording the documents necessary to achieve perfection. See Chicago Title Ins. Co. v.

_Allfirst Bank_, 905 A.2d 366, 381 (Md. 2006) (explaining a "defendant's knowledge of a third party's reliance on the defendant's action may be important in the determination of whether that defendant owes that party a duty of care"); _Iglesias v. Pentagon Title & Escrow, LLC_ 51 A.3d 51, 67-68 (Md. Ct. Spec. App. 2012). The Court finds evidence of this intimate relationship sufficient to establish the requisite intimate nexus between Wells Fargo and ABD necessary for imposition of a tort duty.

Wells Fargo, as the known lender and beneficiary of ABD's documentation services, was also a foreseeable plaintiff in the event ABD failed to exercise reasonable care in carrying out its services. _See Jacques v. First Nat. Bank of Md._, 515 A.2d 756, 760 (Md. 1986). This is so because it would be the lien held by Wells Fargo negatively impacted by such negligence. In addition, the "nature of the business" of ABD supports imposition of a tort duty in this instance.

As explained by the Maryland Court of Appeals:

> The law generally recognizes a tort duty of care arising from contractual dealings with professionals such as physicians, attorneys, architects, and public accountants. Additionally, we have recognized that in those occupations requiring peculiar skill, a tort duty to act with reasonable care will be imposed on those who hold themselves out as possessing the requisite skill.

<u>100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.</u>, 60 A.3d 1, 12 (Md. 2013) (quoting <u>Jacques</u>, 515 A.2d at 763).  Here, ABD orally contracted with Chesapeake for professional services that were for the benefit of Wells Fargo.

As discussed <u>supra</u>, the "question of whether a tort duty is owed is a question of law for the court."  <u>Fried v. Archer</u>, 775 A.2d 430, 438 (Md. Ct. Spec. App. 2001) <u>aff'd sub nom.</u> <u>Muthukumarana v. Montgomery Cnty.</u>, 805 A.2d 372 (Md. 2002). Based upon the foregoing, the Court finds it proper to impose a tort duty on ABD owed to Wells Fargo to exercise reasonable care when providing documentation services in the Cribb transaction, which includes a duty to exercise reasonable care in recording the First Preferred Ship Mortgage and any other documents necessary to perfect any interest held by Wells Fargo in the Faithful.  However, the scope of that duty does not span as far as Wells Fargo may wish.  As discussed herein, there is no credible evidence that part of ABD's documentation services included the affirmative investigation or prevention of fraud in the underlying boat sale transaction.[41]  Consequently, there is no basis to impose such a tort duty on ABD.

---

[41]    Wells Fargo disbursed the funds for the Cribb loan no later than June 9, 2008 – before ABD had even completed its documentation services and filed the First Preferred Ship Mortgage with the Coast Guard.

### iii. Fiduciary/Agency Duty

With respect to the Cribb transaction, Wells Fargo asserts that while handling the Wells Fargo Form Documents and taking the steps necessary to perfect any security interest held by Wells Fargo in the Faithful, ABD acted as an agent of Wells Fargo and, as a result, "had an affirmative obligation to disclose information material to the transaction" to Wells Fargo and owed Wells Fargo a "high standard of care . . . one of scrupulous honesty, skill, and diligence."  Wells Fargo's Opp'n/Cross Summ. J. [Document 195] at 29.

Under Maryland law, agency "is the fiduciary relation which results from the manifestation of consent by one person [the principal] to another [the agent] that the other shall act on his behalf and subject to his control and consent by the other so to act."  Ins. Co. of N. Am. v. Miller, 765 A.2d 587, 593 (Md. 2001) (quoting Green v. H & R Block, Inc., 735 A.2d 1039, 1047 (Md. 1999)).  An agent owes certain fiduciary duties to its principal.  See id. at 597.  The primary duties of an agent are to act solely for the benefit of the principal in all matters within the scope of the agency and to disclose any information the principal may reasonably want to know.  See King v. Bankerd, 492 A.2d 608, 613 (Md. 1985); Miller, 765 A.2d at 597.  A principal-agent relationship can be inferred from the words and conduct of the parties and the circumstances.  Green, 735 A.2d

at 1048.  Factors relevant to the existence of a principal-agent relationship include: "(1) the agent's power to alter the legal relations of the principal; (2) the agent's duty to act primarily for the benefit of the principal; and (3) the principal's right to control the agent."  Id.

As the party alleging the agency relationship, Wells Fargo has the burden of proof to show the existence of a principal-agent relationship and the nature and extent of such a relationship.  Med. Mut. Liab. Ins. Soc. of Md. v. Mut. Fire, Marine & Inland Ins. Co., 379 A.2d 739, 742 (Md. Ct. Spec. App. 1977).  Wells Fargo contends a principal-agent relationship between it and ABD can be inferred from the following evidence:

- ABD documented vessels for Wells Fargo for eight years prior to the Cribb transaction with and without brokers;

- ABD maintained the "Wells Fargo Form Documents" on its computer systems;

- ABD filled in the Wells Fargo Form Documents with information specific to the Cribb transaction; and

- ABD documented the Cribb transaction and recorded Wells Fargo's security interest in the Faithful.

ABD does not respond to the principal-agent contention.[42]

---

[42]   ABD takes issue with Wells Fargo's related position that a fiduciary relationship exists between it and ABD because ABD is analogous to a settlement agent in a real estate transaction. The Court does not find it necessary to address this contention because factual issues exist as to the agency question.

Ordinarily, "'[t]he existence of an agency relationship is a question of fact which must be submitted to the fact finder if any legally sufficient evidence tending to prove the agency is offered.'" Essex Ins. Co. v. Hoffman, 168 F. Supp. 2d 547, 557 (D. Md. 2001) (quoting Faith v. Keefer, 736 A.2d 422, 439 (Md. Ct. Spec. App. 1999)). Here, Wells Fargo has presented legally sufficient evidence that ABD acted as its agent in connection with handling the Wells Fargo Form Documents and taking the steps necessary to perfect any security interest held by Wells Fargo in the Faithful. Yet, there is not "but one inference [that] can be drawn" from this evidence. See generally Globe Indem. Co. v. Victill Corp., 119 A.2d 423, 429 (Md. 1956) (discussing existence of master/servant relationship).

Accordingly, the question of whether ABD acted as Wells Fargo's agent in connection with the Cribb transaction (as well as the scope of such agency) and thus had an affirmative obligation to disclose certain information to Wells Fargo in connection therewith, presents genuine issues of material fact.


### iv.  Canons of Ethics and ABD Brochure

Wells Fargo claims that the American Vessel Documentation Association ("ADVA") Canons of Ethics and/or ABD's brochure give

rise to an independent and affirmative duty on part of ABD to investigate or prevent fraud in the underlying boat transaction.

The ADVA is a nonprofit mutual benefit corporation that is made up of members from the marine industry.  <u>See</u> http://www.americanvessel.com/ (last visited July 10, 2013). One becomes a "member" of the AVDA after being sponsored by an "Active Member" and approved by the Board of Directors; membership requires payment of annual dues.  At the relevant times, ABD was a member of the ADVA.  The ADVA posts the "ADVA Canons of Ethics" on its website.  Canon 8 provides "A Member shall avoid any transaction involving fraud, misrepresentation or unethical conduct."  The plain language of Canon 8 does not express any affirmative obligation undertaken by members of the ADVA to prevent or investigate third party fraud for the benefit of a lender/mortgagee as part of documenting a vessel.  Further, there is no evidence in the record that Wells Fargo relied on the ADVA Canons of Ethics at any point prior to this litigation. Accordingly, the Court finds that the ADVA Canons of Ethics provide no basis to impose an affirmative duty on ABD to prevent and investigate fraud in boat sale transactions as part of documenting any particular vessel.

In the brochure, ABD advertises that it provides documentation services; explains documentation is "a national form of registration" that "provides evidence of nationality for

your vessel"; and that banks require documentation "as it is only through the recordation of the First Preferred Ships Mortgage that a lender can protect its security interest." [Document 195-12]. The brochure also contains a representation that ABD's "Service Representatives are prepared to provide the very best of service." Id. The brochure is pertinent to imposing a tort duty on ABD. Yet, nothing in the brochure can reasonably be construed as a representation that ABD provides fraud prevention and investigation services. Accordingly, there is no basis to impose such a duty upon ABD based upon the language in its advertising materials regarding the quality of its service.

### v. Statutory Duty

Wells Fargo contends that ABD owed it an independent statutory duty to obtain and submit the seller's Certificate of Documentation to the Coast Guard in the Cribb transaction based on the regulatory requirement of 46 C.F.R. § 67.141(a)(4) (the "COD Statute").

Under Maryland law, a tort duty may be established by statute or regulation "'when the plaintiff is a member of the class of persons the statute was designed to protect and the injury was of the type the statute was designed to prevent.'"

Remsburg v. Montgomery, 831 A.2d 18, 27 (Md. 2003) (quoting Erie
Ins. Co. v. Chops, 585 A.2d 232, 234 (Md. 1991)).  In order to
impose a statutory duty, the regulation must "set forth
mandatory acts clearly for the protection of a particular class
of persons rather than the public as a whole."  Gourdine v.
Crews, 955 A.2d 769, 789 (Md. 2008) (declining to impose a duty
under the FDCA because statutory obligations regarding labeling
drug products were framed to protect the public in general)
(internal quotations omitted).  If the plaintiff makes such a
showing and demonstrates the defendant violated the regulation
at issue and that violation proximately caused the injury
complained of by the plaintiff, the plaintiff will have
established a prima facie negligence claim. See Brooks v. Lewin
Realty III, Inc., 835 A.2d 616, 621 (Md. 2003).  However, this
showing does not require a finding of negligence, the "trier of
fact must then evaluate whether the actions taken by the
defendant were reasonable under all circumstances."  Id.

    Wells Fargo asserts the COD Statute is designed primarily
to protect lienholders.[43]  The COD Statute (and related

_____

[43]    To support this position, Wells Fargo relies on the
attached affidavit of James Meere, designated by Wells Fargo as
a vessel documentation expert.  Mere states in his affidavit: "I
believe the purpose of the certificate of documentation ("COD")
requirement and statute (46 CFR 67.141(a)(4) . . . is primarily
to protect lienholders."  Meere Aff. [Document 214-1] ¶ 7.  Mr.
Meere's affidavit is subject to ABD's Motion to Strike [Document
217].  The Court does not find Mr. Meere's belief as to the

provisions) provide, generally, that in order for the Coast
Guard to accept a ship mortgage presented for filing and
recording in the context of a vessel change of ownership, the
ship mortgage must be accompanied with an application for the
exchange of a Certificate of Documentation, and said application
requires submission of the outstanding Certificate of
Documentation.[44]   See 46 C.F.R. § 67.141(a)(4).  This requirement

---

class of persons the COD Statute was designed to protect
pertinent to the statutory duty issue and therefore does not
rely upon it.
[44]    In particular, 46 C.F.R. § 67.231(a) requires that a
mortgage presented for filing and recording with the Coast Guard
must meet the requirements in Subpart O.  In turn, Subpart O
provides in § 67.203(a) that "no instrument will be accepted for
filing unless the vessel to which it pertains is the subject of
(1) A valid Certificate of Documentation; or (2) An application
for initial documentation, exchange of Certificate of
Documentation, return to documentation, or for deletion from
documentation, which is in substantial compliance with the
applicable regulations, submitted to the [NVDC]."  A Certificate
of Documentation becomes invalid immediately when the ownership
of a vessel changes in whole or in part, which requires the
owner to "send or deliver the Certificate to the [NVDC], and
apply for an exchange of the Certificate in accordance with
subpart K of this part."  46 C.F.R. § 67.167(a).
    Subpart K provides:

    The owner of a vessel applying for an
    initial Certificate of Documentation,
    exchange or replacement of a Certificate of
    Documentation, or return of a vessel to
    documentation after deletion from
    documentation must:
    (a) Submit the following to the National Vessel
    Documentation Center:
        (1) Application for Initial Issue, Exchange,
        or Replacement of Certificate of
        Documentation; or Redocumentation (form CG-
        1258);

coincides with the fact that by federal regulation a Certificate

of Documentation becomes invalid immediately upon the change of

ownership in a vessel.  Id. § 67.167(b),(c).  The regulatory

stated purpose of a Certificate of Documentation is that it is

"required for the operation of a vessel in certain trades,

serves as evidence of vessel nationality, and permits a vessel

to be subject to preferred mortgages."  46 C.F.R. § 67.1.

Indeed, unless exempt, the Certificate of Documentation for a

vessel is required to be carried on the vessel.  46 U.S.C. §

12133(a).

It is doubtful that the statutory requirement requiring an

outstanding (and invalid) Certificate of Documentation be

submitted to the Coast Guard as part of change in vessel

ownership and recording of a preferred ship mortgage is designed

to protect any discrete group of people, let alone a discrete

group consisting of lienholders named on preferred ship

mortgages.  Rather, the COD Statute is more akin to an

administrative procedure that assists in implementing the

---

(2) Title evidence, if applicable;
(3) Mortgagee consent on form CG-4593, if
applicable; and
(4) If the application is for replacement of
a mutilated document or exchange of
documentation, the outstanding Certificate
of Documentation.

46 C.F.R. § 67.141 (emphasis added).

regulatory requirement that a valid Certificate of Documentation
be aboard a vessel and available for inspection by law
enforcement.

As discussed _supra_, ABD has submitted unchallenged evidence
that the Coast Guard does not enforce the COD Statute and
therefore will record a preferred ship mortgage sans the
original Certificate of Documentation from the prior owner.  In
this case, the Coast Guard accepted and recorded the First
Preferred Ship Mortgage in the Cribb transaction without the
seller's Certificate of Documentation.  The lack of enforcement
of the COD Statute by the Coast Guard makes it less likely that
the statute is intended to protect lienholders, such as Wells
Fargo.

Even if the COD Statute had been designed to protect
potential lienholders identified in preferred ship mortgages,
there is no reasonable basis to conclude the injury suffered by
Wells Fargo, funding of a fraudulent loan in a fake transaction,
is the type of injury the COD Statute was designed to prevent.
If anything, the COD Statute appears designed to prevent harm
resulting from having an invalid or inaccurate Certificate of
Documentation aboard a vessel.

The Court finds that the COD Statute did not create an
independent statutory duty owed by ABD to Wells Fargo to obtain

the Certificate of Documentation from the "seller" in the Cribb

transaction and to submit the Certificate to the Coast Guard as

part of recording the First Preferred Ship Mortgage and/or

redocumenting the Faithful.  Therefore, violation of that

statute does not give rise to a <u>prima</u> <u>facie</u> negligence claim.

However, that violation may still be submitted as evidence of

negligence.  <u>See</u> <u>Veytsman v. New York Palace, Inc.</u>, 906 A.2d

1028, 1041 (Md. Ct. Spec. App. 2006) ("Violation of a statute,

however, is merely evidence of negligence and is not sufficient

to create a legal duty unless the statute was designed to do

so.").


vi.  <u>Resolution</u>

In sum, the Court finds that based on the "intimate nexus"

between Wells Fargo and ABD, ABD owed Wells Fargo a tort duty to

exercise reasonable care in the provision of its "documentation

services" in the Cribb transaction.  As discussed in connection

with other claims, there are factual issues regarding the extent

of these "documentation services," specifically with respect to

the Certificate of Documentation.[45]  There is also a genuine

---

[45]    The Court has found that there is no evidence to support a
claim that ABD's documentation services included an affirmative
duty to investigate or prevent fraud in the underlying boat sale
transaction and thus the scope of ABD's tort duty does not
include such obligations.

issue of fact as to whether ABD acted as the agent of Wells

Fargo in connection with the Cribb transaction thereby giving

rise to certain fiduciary duties such as a duty to inform.


                    c.    Alleged Breaches

     Wells Fargo identifies numerous "breaches" it maintains

show ABD's negligence as a matter of law and/or create

sufficient factual issues for submission to a jury.    In an

oft-quoted passage, the Maryland Court of Appeals has explained

that:

               Ordinary [negligence] is a question of fact
               to be determined by the jury, and before it
               can be determined as a matter of law that
               one has not been guilty of negligence, the
               truth of all the credible evidence tending
               to sustain the claim of negligence must be
               assumed and all favorable inferences of fact
               fairly    deducible   therefrom   tending    to
               establish negligence drawn ... And Maryland
               has gone almost as far as any jurisdiction
               that we know of in holding that meager
               evidence   of  negligence   is  sufficient   to
               carry the case to the jury. The rule has
               been stated as requiring submission if there
               be  any   evidence,   however  slight,   legally
               sufficient as tending to prove negligence,
               and the weight and value of such evidence
               will be left to the jury.

Fowler v. Smith, 213 A.2d 549, 553 (Md. 1965).  With this

principle at hand, the Court shall evaluate the parties' various

contentions.

In its filings, Wells Fargo identifies the following

"breaches" by ABD:

Breach 1. Failing "to verify JRP's identity" and "to verify the existence of the [Faithful] and the seller's authority to sell the [Faithful]" [Document 137-1] at 11;

Breach 2. Improperly allowing "identity thieves to execute, inter alia, the Bill of Sale, Limited Power of Attorney, Buyer's Declaration and First Preferred Ship Mortgage" [Document 137-1] at 11-12;

Breach 3. Failing to obtain the Certificate of Documentation or title from JRP Marine and/or notify anyone that after request, the "seller" had not produced the Certificate [Document 137-1] at 12;

Breach 4. Failing to "properly perfect" a security interest in the Faithful on behalf of Wells Fargo [Document 195], at 35;

Breach 5. Negligently performing the "Investigative Tasks and Other Services," [Document 195] at 36. These include:

a. Drafting documents not required by the Coast Guard to transfer title such as the Information Verification & Authorization Sheet; Irrevocable Limited Power of Attorney, First Preferred Ship Mortgage;

b. Obtaining, reviewing, and analyzing the Abstract of Title;

c. Contacting the seller to obtain the Certificate of Documentation;

d. Contacting the buyer to inquire about the new name for the Faithful;

e. Investigating whether JRP Marine was in good standing;

f.   Calling the seller about the hailing port and mooring location;

g.   Making efforts to obtain signatures on documents; and

h.   Determining the seller's address from Coast Guard records.  [Document 195] at 11-19.

Breach 6. Failing to discover the Fraud Indicia or disclose the Fraud Indicia Information to Wells Fargo or Chesapeake [Document 195] at 36-37.  These are:

a.   There was no closing sheet or settlement sheet for the Cribb transaction (though not required by ABD because not required on the documents filed by ABD with the Coast Guard);

b.   There were no government issued identifications for the Pences obtained by ABD;

c.   The seller did not provide the Certificate of Documentation to ABD;[46]

d.   The same notary notarized the signature of the "seller" and "buyer" on documents;

e.   Certain documents were notarized in Illinois and loan documents were sent to Illinois for execution by seller and buyer yet:

     i.   The buyer lists a West Palm Beach area code for his phone number,

---

[46]   Wells Fargo states the seller "refused" to provide the Certificate of Documentation.  However, based on the June 2, 2008 letter, the "seller" told ABD it would provide the Certificate after closing.

> ii. The hailing point of the Faithful
> is listed as West Palm Beach on
> ABD's intake sheet,
>
> iii. ABD knew the seller was a Florida
> entity from looking into whether
> it was in good standing, and
>
> iv. The Seller's information on ABD's
> intake lists a phone number with a
> Chicago area code;
>
> f. The Irrevocable Power of Attorney was
> executed and returned without a
> "witness" to the signature [Document
> 195] at 15-17.

It suffices to state that as to virtually all of these alleged Breaches, there are genuine issues of material fact preventing summary judgment. However, to the extent any of the Breaches are based upon the alleged duty on part of ABD to affirmatively investigate or prevent fraud in the underlying boat sale transaction, ABD is entitled to summary judgment where the Court has found it had no tort or contract duty to undertake such action.

### d.    Contributory Negligence of Wells Fargo

In ABD's response to Wells Fargo's Cross-Motion for Summary Judgment [Document 206], ABD states that even if Wells Fargo has made a prima facie negligence claim, Wells Fargo's own negligence becomes "a question of fact for the jury and then

goes on to summarize alleged contributory negligent acts of Wells Fargo.  In its Reply [Document 214], Wells Fargo takes the position that it was not contributorily negligent as a matter of law because "ABD failed to disclose an underwriting expert, and ABD is therefore estopped from raising contributory negligence as a defense."  Because this contention was first raised in the Reply, ABD had no opportunity to respond. Accordingly, the contention will not now be considered. It can be raised, if appropriate, in a motion for judgment as a matter of law at trial.

        D.     <u>Motion in Limine</u>

Wells Fargo has filed a motion in limine to preclude the testimony of Defendant Chesapeake Financial Services, Inc.'s Designated Experts David Griffith, Thomas J. Lekan, and Charles Brian Diggs [Document 175].  However, by the instant Memorandum and Order the Court has significantly reduced and redefined the issues to be tried.  Consequently, the said motions shall be denied without prejudice to re-assertion in whole or part after review of the instant Memorandum and Order.

VI.   <u>CONCLUSION</u>

For the foregoing reasons:

1.   Plaintiff Wells Fargo Dealer Services, Inc.'s
     Motion for Partial Summary Judgment as to
     Defendant Chesapeake Financial Services, Inc.'s
     Liability for Breach of Contract (Count I and
     Count III) and Philip Colonna's Liability for
     Breach of Contract (Count IV) [Document 120] is
     GRANTED.[47]

2.   Defendant Atlantic Boat Documentation, Inc.'s
     Motion for Partial Summary Judgment [Document
     128] is GRANTED IN PART and DENIED IN PART.

3.   Plaintiff's . . . Motion for Partial Summary
     Judgment as to Atlantic Boat Documentation,
     Inc.'s Liability for Negligence [Document 137] is
     GRANTED IN PART and DENIED IN PART.

4.   Defendants Chesapeake Financial Services' and
     Philip Colonna's Motion for Summary Judgment
     [Document 179] (sealed) is GRANTED IN PART and
     DENIED IN PART.

5.   Defendant/Cross-Defendant Atlantic Boat
     Documentation, Inc.'s Motion for Summary Judgment
     [Document 183] is GRANTED IN PART and DENIED IN
     PART.

6.   Plaintiff's . . . Motion for Summary Judgment
     [Document 195] is GRANTED IN PART and DENIED IN
     PART.

7.   Defendant/Cross-Defendant Atlantic Boat
     Documentation, Inc.'s  Motion to Strike Portions
     of Plaintiff's Reply (Document No. 214) and to
     Strike the Affidavits of Meere (Document No. 214-
     1) and Murphy (Document No. 214-2) in their
     Entirety [Document 217] is DENIED.

---

[47]   Though, as discussed herein, Chesapeake's affirmative
defense of equitable estoppel remains pending.

8.      Plaintiff's Motion in Limine to Preclude
        Testimony of Defendant Chesapeake Financial
        Services, Inc.'s Designated Experts David
        Griffith, Thomas J. Lekan, and Charles Brian
        Diggs [Document 175] is DENIED WITHOUT PREJUDICE.

9.      Plaintiff shall arrange a case planning
        conference to be held by August 30 to arrange the
        scheduling of further proceedings, including
        trial.


SO ORDERED, on <u>Thursday, July 18, 2013</u>.


                        _____/s/_____
                           Marvin J. Garbis
                        United States District Judge

**APPENDIX A**

**Summary Chart of Summary Judgment Motions**

| Count/Cross Claim | By | Against | Party Seeking Summary Judgment[48] |
|---|---|---|---|
| Count I Breach of Contract | WF | Chesapeake | • Wells Fargo [Document 120]<br>• C&C [Document 179] |
| Count II: Negligence | WF | Chesapeake | • C&C [Document 179] |
| Count III: Breach of Contract (Guarantor) | WF | Chesapeake | • Wells Fargo [Document 120] |
| Count IV: Breach of Contract (Guarantor) | WF | Colonna | • Wells Fargo [Document 120] |
| Count V: Negligence/ Fiduciary Duty | WF | ABD | • ABD [Documents 128, 183]<br>• Wells Fargo [Documents 137, 195] |
| Count VI: Civil RICO | WF | Chesapeake, Jack Doe, and John Doe | • C&C [Document 179] |
| Count VII: RICO Conspiracy | WF | Chesapeake, Jack Doe, and John Doe | • C&C [Document 179] |
| Cross Claim I: Breach of Contract | C&C | ABD | • ABD [Document 183] |
| Cross Claim II: Contribution | C&C | ABD | None |
| Cross Claim III: Indemnification | C&C | ABD | None |

---

[48]    Including on an affirmative defense to the count/cross claim.